**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SPRING GARNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:13-cv-00090** |
| | ) | |
| **CITY OF OZARK, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS FOR FAILURE TO STATE A CLAIM
AND MOTION FOR SUMMARY JUDGMENT**

Defendants the City of Ozark and Officer Phil Dodson submit this Memorandum in support of their Motion to Dismiss for Failure to State a Claim and Motion for Summary Judgment.  (Doc. 8.)

# TABLE OF CONTENTS

I.  INTRODUCTION .......................................................................... 4

II.  THE COMPLAINT'S FACTUAL ALLEGATIONS ............................................. 5

III.  THE NARRATIVE SUMMARY OF THE UNDISPUTED FACTS ...................... 7

IV.  THE CLAIMS IN THE COMPLAINT ........................................................ 12

V.  ANALYSIS ............................................................................... 13

   A.  The Motion-to-Dismiss Standard .......................................................... 13

   B.  The Summary Judgment Standard ...................................................... 16

   C.  Analysis of the Claims ...................................................................... 17

      1.  Introduction .............................................................................. 17

         a.  The Fictitious Party Claims ....................................................... 17

         b.  The Punitive Damages Claims Against the City .......................... 18

         c.  The Official Capacity Claims ...................................................... 19

         d.  Spring Garner's Individual Capacity Claims ............................. 20

      2.  The Municipal Liability Claims (If There Are Any) ......................... 20

      3.  Officer Dodson's Qualified Immunity Defense .............................. 24

      4.  The Fourth Amendment Unreasonable Seizure Claim ................... 29

      5.  The Fourth Amendment Excessive Force Claim ............................ 33

         a.  Officer Dodson's Right to an Immediate Determination of Qualified

         Immunity ........................................................................... 34

2

b.     The Plaintiff's Burden ................................................................. 35

c.     The Eleventh Circuit's Canine Apprehension Cases .................. 40

d.     The Fourth Amendment Reasonableness Analysis ..................... 45

e.     The Mental Illness Factor ......................................................... 47

6.     The Fourth Amendment False Arrest Claim .................................. 50

7.     The Fourteenth Amendment Due Process Claim ........................... 52

8.     The Title II of the Americans with Disabilities Act Claim .............. 52

a.     The ADA Claim Against Officer Dodson (If There Is One) ........... 53

b.     The ADA Claim Against the City of Ozark .................................. 54

9.     The State Law Negligence Claims Against the City of Ozark .......... 58

10.    The State Law Assault and Battery Claims .................................. 60

a.     The Assault and Battery Claims Against the City ....................... 61

b.     The Assault and Battery Claims Against Officer Dodson ............ 62

c.     Municipal Immunity Under § 6-5-338(b) .................................. 73

VI.  CONCLUSION ........................................................................... 74

CERTIFICATE OF SERVICE ....................................................... 75

## I. INTRODUCTION

This lawsuit arises from Officer Phil Dodson's forcible apprehension of an eighteen year-old man after the man tried to enter an occupied dwelling at nighttime, tried to choke Officer Dodson and tried to escape.  (Doc. 9-1 at 1-4, ¶¶ 3-14.)   This motion is based on "the Supreme Court's call for a 'firm application of the Federal Rules of Civil Procedure' in cases where qualified immunity is asserted."  GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998) (quoting Butz v. Economou, 438 U.S. 478, 508 (1978)).

Officer Dodson invokes the qualified immunity defense against all federal claims and the State-agent immunity defense against all state law claims.  See O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004) ("Government officials sued for acts committed in the course of their official duties may invoke the defense of qualified immunity."); Ala. Code § 6-5-338(a) (1975) (establishing State-agent immunity for police officers).  The City of Ozark invokes the State-agent immunity and municipal immunity defenses against all state law claims. See Ala. Code §§ 6-5-338(b), 11-47-190 (1975).

The complaint's factual allegations are just that – allegations.  The City of Ozark and Officer Dodson dispute the accuracy of the complaint's factual allegations, but for purposes of their motion to dismiss, they will address the allegations as if they were true.  The City of Ozark and Officer Dodson examine the factual allegations in this light only because that is required for a motion to dismiss.  See Papasan v. Allain, 478 U.S. 265, 286 (1986) ("for the purposes of

4

this motion to dismiss we must take all the factual allegations in the complaint as true").

## II.  THE COMPLAINT'S FACTUAL ALLEGATIONS

As is commonly the case, the complaint recites its factual allegations from the plaintiff's perspective.  (Doc. 1 at 3-6, ¶¶ 7-37.)  Although this is a natural inclination on the part of plaintiffs, the Court should not allow itself to be drawn into this immaterial point of view.  "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009).

The Supreme Court instructs that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).  With that in mind, this memorandum ignores those factual allegations that could not have been known to Officer Dodson when he made his use of force decisions.

According to the complaint, Officer Dodson was a canine handler for the City of Ozark's police department.  (Doc. 1 at 3, ¶¶ 7-8.)  On April 5, 2011, a woman identified as "Mrs. Brasher of Eufaula Street" notified the police that a male was in her yard and would not speak or leave when asked.  (Doc. 1 at 4, ¶ 21.)  The complaint alleges that the trespasser was an eighteen year-old man named Wynter Stokes.  (Doc. 1 at 2-4, ¶¶ 2, 11 & 21.)  The complaint alleges that Officer Dodson responded to the scene.  (Doc. 1 at 4, ¶ 22.)

5

The complaint alleges that a "Larry Brasher" told "a white male officer that an unarmed person was on his porch." (Doc. 1 at 4-5, ¶ 23.) According to the complaint, "Mr. Brasher also told the officer that there was something different about the unarmed person that was on his porch. He explained to the officer that he had an autistic child and that the person on the porch seemed to act like his son would act." (Doc. 1 at 5, ¶ 23.) The complaint does not allege that Officer Dodson was the officer with whom Larry Brasher spoke. (Doc. 1 at 4-5, ¶ 23.) In truth, Mr. Brasher spoke to a different officer. (Doc. 9-1 at 4, ¶ 18.)

The complaint alleges:

30. ***It is upon information and belief,*** that without provocation and/or cause Defendant Dodson attempted to arrest and/or subdue Plaintiff Wynter Stokes by causing a police canine to attack him.

31. Thereafter, without provocation and/or cause, Defendant Dodson commanded the police canine unit, trained and controlled, by him to attack Plaintiff Wynter Stokes. Once Plaintiff Wynter Stokes was on the ground, Dodson failed to handcuff and/or adequately restrain Plaintiff Wynter Stokes.

32. Defendant Dodson again without provocation and/or cause commanded the police canine unit to attack Plaintiff Wynter Stokes. Again, Defendant Dodson failed to handcuff and/or adequately restrain Plaintiff Wynter Stokes.

33. Defendant Dodson once again without provocation and/or cause commanded the police canine unit to attack Plaintiff Wynter Stokes. It was only after this third ordered attack, did Defendant Dodson adequately and/or properly restrain Plaintiff Wynter Stokes.

34. During the three commanded police canine unit attacks, Plaintiff Wynter Stokes suffered severe scratches, scrapes, lacerations, and/or dog bites for which he had to seek medical attention.

(Doc. 1 at 5-6, ¶¶ 30-34 (emphasis added).)

The complaint does not identify any source for its allegations of an unprovoked attack. As Officer Dodson's affidavit shows, these allegations are untrue. (Doc. 9-1 at 2-3, ¶¶ 7-14.)

## III.  THE NARRATIVE SUMMARY OF THE UNDISPUTED FACTS

Officer Dodson's affidavit is attached to this memorandum. (Doc. 9-1.) Officer Dodson is currently employed by the City of Ozark as a police officer. (Doc. 9-1 at 1, ¶ 2.)  Officer Dodson was also employed as an Ozark police officer on April 5, 2011. (Doc. 9-1 at 1, ¶ 2.) As an Ozark police officer, Officer Dodson's duties include the enforcement of the criminal laws of this state. (Doc. 9-1 at 1, ¶ 2.)  Officer Dodson is empowered by the laws of this state to execute warrants and to arrest and to take into custody persons who violate the criminal laws of this state. (Doc. 9-1 at 1, ¶ 2.)

On Tuesday, April 5, 2011, Officer Dodson was on duty as an Ozark police officer and was working his regular shift. (Doc. 9-1 at 1, ¶ 3.)  Around 9:11 p.m., Officer Dodson was dispatched to assist Officer Thomas Tripp on a burglary-in-progress call at 594 East Eufaula Street in Ozark. (Doc. 9-1 at 1, 3.)  The dispatcher notified Officer Dodson that a black male wearing a light colored shirt was trying to get into the residence. (Doc. 9-1 at 1, ¶ 3.)

While Officer Dodson was responding to the call, he saw a black male approaching South Union Avenue from Eufaula Street. (Doc. 9-1 at 1, ¶ 4.) This location was approximately five blocks from the scene of the burglary call.

(Doc. 9-1 at 1, ¶ 4.)  The man was walking at a brisk pace away from the scene.  (Doc. 9-1 at 1, ¶ 4.)  Officer Dodson did not see any other people in the area.  (Doc. 9-1 at 1, ¶ 4.)

Over the radio, Officer Dodson asked Officer Tripp for a description of the suspect.  (Doc. 9-1 at 1, ¶ 5.)  The dispatcher answered that the suspect was a black male with a light colored shirt, short hair and facial hair.  (Doc. 9-1 at 1, ¶ 5.)  The man Officer Dodson saw was wearing a light gray shirt, had short hair, and had facial hair.  (Doc. 9-1 at 1, ¶ 5.)  Officer Dodson immediately turned around and located the suspect, who by then had crossed South Union Avenue.  (Doc. 9-1 at 1-2, ¶ 5.)

Officer Dodson activated the blue strobe lights on his police vehicle and stopped in front of the florist shop.  (Doc. 9-1 at 2, ¶ 6.)  Officer Dodson stepped out of his vehicle to detain the suspect.  (Doc. 9-1 at 2, ¶ 6.)  Officer Dodson was wearing a gray Ozark police officer's uniform with police identification patches on both sleeves, a badge on the front of his shirt, and a police equipment belt.  (Doc. 9-1 at 2, ¶ 6.)

Officer Dodson told the suspect that he needed to talk to him.  (Doc. 9-1 at 2, ¶ 7.)  The suspect tried to flee.  (Doc. 9-1 at 2, ¶ 7.)  Officer Dodson grabbed the suspect by his shirt, turned him around, and asked for his name.  (Doc. 9-1 at 2, ¶ 7.)  As Officer Dodson tried to control the suspect, the suspect pulled away at first.  (Doc. 9-1 at 2, ¶ 7.)  Officer Dodson then grabbed the suspect by his arm, and the suspect grabbed Officer Dodson by the throat.  (Doc. 9-1 at 2, ¶ 7.)  Officer Dodson pushed the suspect away.  (Doc. 9-1 at 2, ¶

7.)  Officer Dodson tried to restrain the suspect by grabbing him by the arm again.  (Doc. 9-1 at 2, ¶ 7.)  Again, the suspect tried to grab Officer Dodson by the throat.  (Doc. 9-1 at 2, ¶ 7.)  Officer Dodson pushed the suspect away again.  (Doc. 9-1 at 2, ¶ 7.)

The suspect began running south on South Union Avenue toward College Street.  (Doc. 9-1 at 2, ¶ 8.)  Officer Dodson warned the suspect to stop or he would send his dog.  (Doc. 9-1 at 2, ¶ 8.)  The suspect continued to run.  (Doc. 9-1 at 2, ¶ 8.)  Officer Dodson commanded his dog to apprehend the suspect.  (Doc. 9-1 at 2, ¶ 8.)  After a short chase, the dog tackled the suspect to the ground.  (Doc. 9-1 at 2, ¶ 8.)  Officer Dodson immediately recalled the dog to his side.  (Doc. 9-1 at 2, ¶ 8.)  Officer Dodson ordered the suspect to stay on the ground.  (Doc. 9-1 at 2, ¶ 8.)

When the dog moved away from the suspect, the suspect got up and began to run north on South Union Avenue behind BB&T Bank on the opposite side of the street.  (Doc. 9-1 at 2, ¶ 9.)  Officer Dodson again ordered his dog to apprehend the suspect.  (Doc. 9-1 at 2, ¶ 9.)  The dog tackled the suspect as he was scaling a low retaining wall.  (Doc. 9-1 at 2, ¶ 9.)  When the suspect fell to the ground, Officer Dodson immediately ordered the dog to return to him.  (Doc. 9-1 at 2-3, ¶ 9.)  Officer Dodson again ordered the suspect to stay on the ground.  (Doc. 9-1 at 3, ¶ 9.)

When the dog moved away from the suspect, the suspect got up again and began running toward East Avenue.  (Doc. 9-1 at 3, ¶ 10.)  Officer Dodson commanded the dog to apprehend the suspect again.  (Doc. 9-1 at 3, ¶ 10.)

9

Lieutenant Anthony Spedale arrived at the intersection of East Avenue and Eufaula Street.  (Doc. 9-1 at 3, ¶ 11.)  Officer Dodson called the dog away from the suspect and back to his side.  (Doc. 9-1 at 3, ¶ 11.)  The suspect continued to flee.  (Doc. 9-1 at 3, ¶ 11.)

Lieutenant Spedale ordered the suspect to stay on the ground.  (Doc. 9-1 at 3, ¶ 12.)  Lieutenant Spedale tried unsuccessfully to apprehend the suspect with a Taser.  (Doc. 9-1 at 3, ¶ 12.)  The suspect jumped a fence and entered a plant nursery called the Potting Shed.  (Doc. 9-1 at 3, ¶ 12.)

Officer Dodson approached the nursery and directed his dog to scale the fence.  (Doc. 9-1 at 3, ¶ 13.)  Officer Dodson also crossed the fence.  (Doc. 9-1 at 3, ¶ 13.)  Officer Dodson ordered his dog to conduct an area search for the suspect.  (Doc. 9-1 at 3, ¶ 13.)  The dog located the suspect hiding in heavy brush on the far side of the premises.  (Doc. 9-1 at 3, ¶ 13.)  The dog apprehended the suspect in the brush.  (Doc. 9-1 at 3, ¶ 13.)  Officer Dodson went to that area and called the dog back to his side.  (Doc. 9-1 at 3, ¶ 13.) The dog had been engaged with the suspect for approximately thirty seconds.  (Doc. 9-1 at 3, ¶ 13.)  Officer Dodson ordered the suspect to lie still on the ground, and the suspect initially complied.  (Doc. 9-1 at 3, ¶ 13.)  Officer Dodson called for another officer to come handcuff the suspect while he restrained the dog.  (Doc. 9-1 at 3, ¶ 13.)

Officer Tripp arrived.  (Doc. 9-1 at 3, ¶ 14.)  Officer Dodson told Officer Tripp to hold the suspect by his shirt, because he would run.  (Doc. 9-1 at 3, ¶ 14.)  Officer Tripp tried to handcuff the suspect.  (Doc. 9-1 at 3, ¶ 14.)  The

suspect resisted handcuffing and would not allow his arms to be brought together behind his back. (Doc. 9-1 at 3, ¶ 14.) On the radio, Officer Dodson called out that the suspect was still resisting and that they needed some help. (Doc. 9-1 at 3-4, ¶ 14.) Officer Dodson was restraining his dog and could not assist Officer Tripp. (Doc. 9-1 at 4, ¶ 14.) Lieutenant Spedale arrived and helped Officer Tripp handcuff the suspect. (Doc. 9-1 at 4, ¶ 14.)

The suspect sustained numerous scratches and abrasions during his apprehension. (Doc. 9-1 at 4, ¶ 15.) Corporal Jesse Kellum transported the suspect directly to Dale Medical Center for treatment. (Doc. 9-1 at 4, ¶ 15.)

The suspect was later identified as Wynter Stokes. (Doc. 9-1 at 4, ¶ 16.) To the best of Officer Dodson's knowledge, he had never seen Mr. Stokes before he tried to detain him at Dale Florist that night. (Doc. 9-1 at 4, ¶ 16.) Officer Dodson did not learn that Mr. Stokes was reportedly autistic until after Mr. Stokes was in custody and the incident was over. (Doc. 9-1 at 4, ¶ 16.)

Officer Dodson did not harbor any animosity or ill will toward Mr. Stokes. (Doc. 9-1 at 4, ¶ 17.) Officer Dodson was just trying to do his job and detain Mr. Stokes in response to the citizen's report of a burglary-in-progress. (Doc. 9-1 at 4, ¶ 17.) Based on Mr. Stokes' attempts to grab Officer Dodson's throat and the initial report that Mr. Stokes tried to enter someone's home, Officer Dodson believed Mr. Stokes posed a serious and imminent danger to himself, to other officers responding to this call, and to any members of the public with whom Mr. Stokes might come into contact. (Doc. 9-1 at 4, ¶ 17.)

Officer Dodson has reviewed paragraphs 22 and 23 of the complaint. (Doc. 9-1 at 4, ¶ 18.)  Officer Dodson encountered Mr. Stokes on his way to 594 East Eufaula Street.  (Doc. 9-1 at 4, ¶ 18.)  Officer Dodson never actually arrived at 594 East Eufaula Street that night.  (Doc. 9-1 at 4, ¶ 18.)  Larry Brasher did not speak to Officer Dodson.  (Doc. 9-1 at 4, ¶ 18.)

## IV.  THE CLAIMS IN THE COMPLAINT

Spring Garner filed this lawsuit on February 12, 2013.  (Doc. 1.)  Garner sues as parent and next friend of Wynter Stokes and in her individual capacity. (Doc. 1 at 2, ¶ 2.)  The complaint contains eight counts:

- Count One asserts a section 1983 claim for excessive force under the Fourth Amendment.  (Doc. 1 at 7, ¶¶ 38-41.)

- Count Two asserts a section 1983 claim for unreasonable seizure under the Fourth Amendment.  (Doc. 1 at 7-8, ¶¶ 42-44.)

- Count Three asserts a section 1983 claim for unlawful arrest under the Fourth and Fourteenth Amendments.  (Doc. 1 at 8-9, ¶¶ 45-49.)

- Count Four asserts a claim under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.  (Doc. 1 at 9-10, ¶¶ 50-60.)

- Count Five asserts state law negligence claims.  (Doc. 1 at 11-12, ¶¶ 61-65.)

- There is no Count Six.

- Count Seven asserts state law negligence claims against fictitious parties.  (Doc. 1 at 12-13, ¶¶ 66-71.)

- Count Eight asserts a state law assault claim.  (Doc. 1 at 13-14, ¶¶ 72-75.)

- Count Nine asserts a state law battery claim. (Doc. 1 at 14, ¶¶ 76-79.)

This memorandum demonstrates that all of the complaint's claims except the Fourth Amendment excessive force claim against Officer Dodson and the state law assault and battery claims against Officer Dodson should be dismissed with prejudice for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  This memorandum further demonstrates that the City of Ozark and Officer Dodson are entitled to summary judgment on all claims, including the Fourth Amendment excessive force claim against Officer Dodson and the state law assault and battery claims against Officer Dodson.  See Fed. R. Civ. P. 56.

## V.  ANALYSIS

### A.    The Motion-to-Dismiss Standard

"A pleading that states a claim for relief must contain … (2) a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Rule 12 of the Federal Rules of Civil Procedure permits a party to raise by motion the defense of "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).  "To survive a [Rule 12(b)(6)] motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007).   "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).

"Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009).   When the allegations of a complaint stop short of excluding "more likely explanations" or an "obvious alternative explanation,"

the complaint does not state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 681-82, 129 S. Ct. 1937, 1951-52 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 567, 127 S. Ct. 1955, 1972 (2007). A pleading also does not satisfy the requirements of Rule 8 when it merely "le[aves] open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561, 127 S. Ct. 1955, 1968 (2007).

"A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth – legal conclusions must be supported by factual allegations." Randall v. Scott, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Once the court isolates the factual allegations, "[p]lausibility is the key." Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1333 (11th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

Also, "[a] complaint is subject to dismissal under Rule 12(b)(6) when its allegations, on their face, show that an affirmative defense bars recovery on the claim." Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003).

## B.   The Summary Judgment Standard

According to Rule 56 of the Federal Rules of Civil Procedure, "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(b).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that

> an adverse party cannot produce admissible evidence
> to support the fact.

Fed. R. Civ. P. 56(c)(1).

"After the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (internal citations omitted).

## C.   Analysis of the Claims

### 1.   Introduction

The counts of the complaint are somewhat confusing. This introductory section will attempt to narrow the issues. Subsequent sections will address the claims in a more logical order than they are presented in the complaint.

#### a.   The Fictitious Party Claims

Every count of the complaint purports to sue fictitious party defendants. (Doc. 1 at 7-14, ¶¶ 38-79.) The City of Ozark and Officer Dodson move to

dismiss all fictitious party claims as to all counts because fictitious party pleading is not allowed under the Federal Rules of Civil Procedure.  See Love v. Town of Ariton, No. 1:10-cv-105-MEF, 2010 WL 1052852, at *1 (M.D. Ala. Mar. 23, 2010) (Fuller, C.J.) ("The Court finds that there is no fictitious party practice in federal courts.); Adams v. Franklin, 111 F. Supp. 2d 1255, 1259 n.3 (M.D. Ala. 2000) (DeMent, J.) ("fictitious party practice is not authorized by either the Federal Rules of Civil Procedure or any federal statute").  The City of Ozark and Officer Dodson move to dismiss the fictitious party allegations because those allegations do not state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

###### b.    The Punitive Damages Claims Against the City

Every count of the complaint claims punitive damages from all defendants, including the City of Ozark.  (Doc. 1 at 7-14, ¶¶ 38-79.)  Punitive damages are not recoverable from a municipality under 42 U.S.C. § 1983, see City of Newport v. Fact Concerts, Inc., 453. U.S. 247, 271 (1981), under Title II of the Americans with Disabilities Act, see Barnes v. Gorman, 536 U.S. 181, 189-90, 122 S. Ct. 2097, 2103 (2002), or under state law, see Ala. Code § 6-11-26 (1975).  The City of Ozark moves to dismiss all punitive damages claims against it for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

c.    The Official Capacity Claims

Paragraph 4 of the complaint states that Officer Dodson "is named as a [d]efendant in both his official and individual capacit[ies]." (Doc. 1 at 2, ¶ 4.) Officer Dodson moves to dismiss all official capacity claims against him, because they are redundant to the claims against the City of Ozark.

"The Eleventh Circuit has instructed courts to treat suits against government agents in their official capacities as functionally equivalent to suits against the municipality itself." Durruthy v. City of Miami, No. 01-4155-CIV-MORENO, 2002 WL 31829582, at *1 (S.D. Fla. Dec. 13, 2002) (Moreno, J.). According to the Supreme Court, "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity." Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985) (internal citation omitted); see also Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond)."); Key v. City of Cullman, 826 So. 2d 151, 156 (Ala. Civ. App. 2001) (as to state law claims).  Based on these authorities, Officer Dodson moves to dismiss all official capacity claims.

### d. Spring Garner's Individual Capacity Claims

In paragraph 2, the complaint states, "Spring Garner brings this lawsuit as parent and next friend of Wynter Stokes and in her individual capacity." (Doc. 1 at 2, ¶ 2.)   However, none of the counts of the complaint actually asserts a claim on behalf of Spring Garner.   (Doc. 1.)   The City of Ozark and Officer Dodson move to dismiss Spring Garner as a plaintiff for failure to state a claim upon which relief can be granted.   See Fed. R. Civ. P. 12(b)(6).

## 2. The Municipal Liability Claims (If There Are Any)

Having narrowed the claims slightly, this memorandum next addresses the Fourth Amendment claims in Counts One, Two and Three.   (Doc. 1 at 7-9, ¶¶ 38-49.)   It begins with the municipal liability claims against the City, if there are any.

None of the first three counts of the complaint explicitly alleges a section 1983 municipal liability claim against the City of Ozark in the body of the count.   Count One comes closest when it alleges that Officer Dodson was "acting" in his official capacity, (Doc. 1 at 7, ¶ 39), but Count One does not specify that it actually sues Officer Dodson in his official capacity.   Considering that Count One does not plead any of the elements of a municipal liability claim, the plaintiff probably meant to allege that Officer Dodson was acting under color of law.

Paragraph 4 generally alleges that Officer Dodson "is named . . . in . . . his official . . . capacity."   (Doc. 1 at 2, ¶ 4.)   However, to construe that bare

allegation to apply to each count of the complaint would convert the complaint into an impermissible shotgun pleading:

> The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (*i.e.*, all but the first) contain irrelevant factual allegations and legal conclusions. Consequently, in ruling on the sufficiency of a claim, the trial court must sift out the irrelevancies, a task that can be quite onerous.

Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 (11th Cir. 2002).

The Eleventh Circuit "has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay."  Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 n.9 (11th Cir. 2002).  "The use of shotgun pleadings in civil cases is a ubiquitous problem."  Morro v. City of Birmingham, 117 F.3d 508, 515 (11th Cir. 1997).  "The result is a massive waste of judicial and private resources."  Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1333 (11th Cir. 1998).

In this case, the complaint is further complicated by its cut-and-paste *ad damnun* clauses, which use the phrase "defendants, jointly and severally," at the end of every single count.  (Doc. 1 at 7-14.)  As a result, every count of the complaint demands relief from a defendant that is not actually named in the body of the count.  (Doc. 1 at 7-14.)

Because of this confusion, the City of Ozark must address the potential for a municipality liability claim.  However, the City's primary argument is that Counts One, Two and Three do not assert municipal liability claims.

Assuming that the Court disagrees with the defendants and interprets Counts One, Two and Three to assert claims against the City, the City moves to dismiss all three counts for failure to state a claim upon which relief can be granted.  <u>See</u> Fed. R. Civ. P. 12(b)(6).

"The Supreme Court has placed strict limitations on municipal liability under § 1983."  <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998). "[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  <u>Board of the County Commr.'s v. Brown</u>, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997).  "A city may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom." <u>Lewis v. City of West Palm Beach</u>, 561 F.3d 1288, 1293 (11th Cir. 2009).

"To impose section 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004).  The complaint does not meet these requirements.

In a later section of this Memorandum, the analysis of the Fourth Amendment claims against Officer Dodson demonstrates that there are no underlying Fourth Amendment violations upon which to predicate municipal liability claims against the City of Ozark.  <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573 (1986) (holding municipal liability cannot attach absent an underlying constitutional violation).  Even if an underlying

22

constitutional violation could be shown, however, Counts One, Two and Three do not plead factual allegations which plausibly demonstrate that the City of Ozark had a custom or policy that constituted deliberate indifference to any constitutional right, or that a city custom or policy caused the alleged violation. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

"Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).  A pleading does not satisfy the requirements of Rule 8 when it merely "le[aves] open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561, 127 S. Ct. 1955, 1968 (2007).  "It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management,' given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967 (2007).

Counts One, Two and Three lack the factual allegations that are required to state a municipal liability claim under § 1983. See McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) ("To impose section 1983 liability on a

23

municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."). Accordingly, the City of Ozark moves to dismiss Counts One, Two and Three for failure to state a municipal liability claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6).

### 3.   *Officer Dodson's Qualified Immunity Defense*

The defendants interpret Counts One, Two and Three to assert Fourth Amendment claims against Officer Dodson based on (1) the initial detention of Mr. Stokes (Count Two), (2) the use of force to effect the detention of Mr. Stokes (Count One), and (3) the custodial arrest of Mr. Stokes after his detention (Count Three). (Doc. 1 at 7-9, ¶¶ 38-49.) This memorandum addresses those claims in that order and explains why Officer Dodson is entitled to qualified immunity against each claim. Before turning to the merits of those claims, however, this memorandum explains the doctrine of qualified immunity.

Officer Dodson invokes the qualified immunity defense against Counts One, Two and Three. See O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004)( "Government officials sued for acts committed in the course of their official duties may invoke the defense of qualified immunity."). "Qualified immunity is an immunity from suit rather than a mere defense from liability." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). "The purpose of qualified immunity is to ensure that officials are not deterred or distracted from

24

carrying out their official duties because of fear of a later lawsuit." Robinson v. Arrugueta, 415 F.3d 1252, 1257 n.5 (11th Cir. 2005).

"In order to spare officials who are entitled to immunity from the burden of litigation, the availability of qualified immunity should be evaluated early in the proceedings." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). Indeed, "the defense of qualified immunity should be resolved at the earliest possible procedural moment." Amnesty Int'l v. Battle, 559 F.3d 1170, 1179 (11th Cir. 2009). "Until this threshold immunity question is resolved, discovery should not be allowed." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

"The qualified immunity inquiry involves three steps: (1) the alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, we must then determine whether that conduct violates a constitutional right; (3) if so, we must inquire whether the asserted right was clearly established at the time of the alleged violation." Tinker v. Beasley, 429 F.3d 1324, 1326 (11th Cir. 2005).

"To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)). "In many areas other than qualified immunity, a 'discretionary function' is defined as an activity requiring the exercise of independent judgment, and is the opposite of a 'ministerial task.' In the qualified immunity context, however, we appear to have

abandoned this 'discretionary function/ministerial task' dichotomy." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). "For purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).

"Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities.  Our inquiry is two-fold.  We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).  "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).

"In assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures is a part of his job-related powers and responsibilities." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004). "In considering whether an act of allegedly excessive force fell within a police

officer's duties, for example, we do not ask whether police have the right to use excessive force.  We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest.  We instead ask whether they have the power to attempt to effectuate arrests."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).

The complaint alleges that Officer Dodson was a police officer of the City of Ozark.  (Doc. 1 at 2, ¶ 4.)  The complaint alleges that Officer Dodson was "duly appointed" and was "authorized to enforce the laws of Alabama and was so acting" during the events in question.  (Doc. 1 at 3, ¶ 7.)  The complaint also alleges that Officer Dodson "was acting within the course and scope" of his employment with the City of Ozark.  (Doc. 1 at 3, ¶ 9.)

Likewise, Officer Dodson's affidavit establishes that he was "on duty as an Ozark police officer working [his] regular shift," (Doc. 9-1 at 1, ¶ 3), and that his "duties include the enforcement of the criminal laws of the state."  (Doc. 9-1 at 1, ¶ 2.)  Accordingly, it is undisputed that Officer Dodson was performing a discretionary function when he apprehended Mr. Stokes.

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply."  Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009).  "[T]he burden is on the plaintiff to show that, when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood

27

his acts were unlawful." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

"Plaintiff cannot discharge her burden simply by making general, conclusory allegations of some constitutional violation or by stating broad legal truisms.  Rather, as the courts have stated, plaintiffs must prove the existence of a clear, factually-defined, well-recognized right of which a reasonable police officer should have known." Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir. 1989). "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms." Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir. 1989) (quoting Azeez v. Fairman, 795 F.2d 1296, 1301 (7th Cir. 1986)).

"To determine whether an officer is entitled to qualified immunity, we engage in a two-step analysis." Garrett v. Athens-Clarke County, 378 F.3d 1274, 1278 (11th Cir. 2004).  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, __ U.S. __, 131 S. Ct. 2074, 2080 (2011).  "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010).

The qualified immunity standard is high: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that ***every reasonable official*** would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, __ U.S. __, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)) (internal punctuation omitted and emphasis added); see also Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) ("Qualified immunity protects government officials, in their individual capacities, from suit unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that ***every objectively reasonable official*** standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances.") (emphasis added).

"If reasonable public officials could differ on the lawfulness of the defendants' actions, the defendants are entitled to immunity." Kingsland v. City of Miami, 382 F.3d 1220, 1231 (11th Cir. 2004).  In the words of the Supreme Court, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, __ U.S. __, 131 S. Ct. 2074, 2083 (2011).

### 4.   *The Fourth Amendment Unreasonable Seizure Claim*

Based on the Supreme Court's opinion in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), and Alabama Code § 15-5-30 (1975), Officer Dodson was

authorized to detain Mr. Stokes based on a reasonable suspicion of criminal trespass and attempted burglary.

"Under the Supreme Court's seminal decision in <u>Terry v. Ohio</u>, 'law enforcement officers may seize a suspect for a brief, investigatory . . . stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" <u>United States v. Lewis</u>, 674 F.3d 1298, 1303 (11th Cir. 2012) (quoting <u>United States v. Jordan</u>, 635 F.3d 1181, 1186 (11th Cir. 2011)).

Alabama has codified <u>Terry</u>:

> A sheriff or other officer acting as sheriff, his deputy or any constable, acting within their respective counties, any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions.

Ala. Code § 15-5-30 (1975).

"A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1165-66 (11th Cir. 2000). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1166 (11th Cir. 2000).

The complaint alleges that "Mrs. Brasher of Eufaula Street notified the police that an individual (Plaintiff Wynter Stokes) was in her yard and would not . . . leave when asked." (Doc. 1 at 4, ¶ 21.) Accordingly, the complaint demonstrates that Officer Dodson had a reasonable suspicion to detain (and probable cause to arrest) Mr. Stokes for Criminal Trespass in the Third Degree: "A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises." Ala. Code § 13A-7-4 (1975). Accordingly, Officer Dodson moves to dismiss the unreasonable seizure claim based on the qualified immunity defense.

The affidavit of Officer Dodson also demonstrates arguable reasonable suspicion to detain Mr. Stokes for suspicion of Attempted Burglary Third Degree: "A person commits the crime of burglary in the third degree if he knowingly enters or remains unlawfully in a building with intent to commit a crime therein." Ala. Code § 13A-7-7 (1975). "A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense." Ala. Code § 13A-4-2(a) (1975).

A dispatcher told Officer Dodson that a citizen had called for police assistance and reported that a black male wearing a light colored shirt with short hair and facial hair was trying to get inside her residence. (Doc. 9-1 at 1, ¶¶ 3, 5.) Officer Dodson discovered Mr. Stokes walking away from the area of the woman's residence at a brisk pace, and Mr. Stokes matched the burglary suspect's description. (Doc. 9-1 at 1, ¶ 5.) At the very least, Officer Dodson

had an arguable reasonable suspicion to detain Mr. Stokes to investigate the reported burglary attempt. Accordingly, Officer Dodson also moves for summary judgment on the unreasonable seizure claim based on the qualified immunity defense.

Arguably, Officer Dodson's seizure of Mr. Stokes should actually be evaluated as of the moment of Mr. Stokes' apprehension inside the fenced perimeter of the plant nursery. In other words, all of Mr. Stokes' actions leading up to his ultimate capture should be considered in the calculus of the reasonable suspicion analysis. Up until the point that Officer Tripp and Lieutenant Spedale actually handcuffed Mr. Stokes, there was only an attempted seizure. Attempted seizures are beyond the scope of the Fourth Amendment. See Brendlin v. California, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405 (2007) ("there is no seizure without actual submission"); County of Sacramento v. Lewis, 523 U.S. 833, 845 n.7, 118 S. Ct. 1708, 1716 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment"); California v. Hodari D., 499 U.S. 621, 626, 111 S. Ct. 1547, 1550 (1991) ("The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the suspect does not yield. We hold that it does not."); but see Vaughan v. Cox, 343 F.3d 1323, 1329 n.5 (11th Cir. 2003) ("Because Vaughan was hit by a bullet that was meant to stop him, he was subjected to a Fourth Amendment seizure . . . . The fact that Vaughan was not taken into custody immediately following the shooting is immaterial.").

32

By the time Mr. Stokes was actually captured, he had run from Officer Dodson, pulled away from Officer Dodson, grabbed Officer Dodson by the throat, entered the fenced property of the plant nursery, and resisted handcuffing.  (Doc. 9-1 at 2-4, ¶¶ 7-14.)  Accordingly, Officer Dodson also had arguable reasonable suspicion to detain Mr. Stokes, and arguable probable cause to arrest him, for the following additional offenses:

- Obstructing Governmental Operations under Ala. Code § 13A-10-2 (1975);

- Harassment under Alabama Code § 13A-11-8 (1975);

- Assault in the Second Degree under Alabama Code § 13A-6-21(a)(4) (1975);

- Criminal Trespass in the Second Degree under Alabama Code § 13A-7-3 (1975); and

- Resisting Arrest under Alabama Code § 13A-10-41 (1975); and

- Fleeing or Attempting to Elude a Law Enforcement Officer under Alabama Code § 13A-10-52 (1975).

Under both the motion-to-dismiss standard and the summary judgment standard, Officer Dodson is entitled to qualified immunity against the unreasonable seizure claim.

### 5.    *The Fourth Amendment Excessive Force Claim*

"The right to make an investigatory stop carries with it the right to use some degree of physical coercion or threat thereof to effect it.  Determining whether the degree of force used was reasonable requires consideration of the exigencies of the immediate situation and the officers' being forced to make split-second decisions."  Jackson v. Sauls, 206 F.3d 1156, 1171-72 (11th Cir.

33

2000) (citing <u>Courson v. McMillian</u>, 939 F.2d 1479 (11th Cir. 1991)); <u>see also</u> <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989) ("the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it").   The plaintiff does not have any evidence of excessive force, because none occurred. Officer Dodson moves for summary judgment on the Fourth Amendment excessive force claim.[1]   (Doc. 1 at 7, ¶¶ 38-41.)

a.   Officer Dodson's Right to an Immediate Determination of Qualified Immunity

Officer Dodson seeks an immediate determination of his entitlement to qualified immunity.   "There is a strong public interest in protecting public officials from the costs associated with the defense of damages actions." <u>Crawford-El v. Britton</u>, 523 U.S. 574, 590 (1998).   "The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." <u>Davis v. Scherer</u>, 468 U.S. 183, 195, 104 S. Ct. 3012, 3019 (1984).   "In order to spare officials who are entitled to immunity from the burden of litigation, the availability of qualified immunity should be evaluated early in the proceedings." <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007).

---

[1] Officer Dodson does not argue that dismissal would be appropriate if the complaint's allegations of an unprovoked dog attack were accepted as true.   (Doc. 1 at 5-6, ¶¶ 30-33.) However, those allegations are not true.   Even the complaint prefaces them with the phrase, "It is on information and belief . . . ."   (Doc. 1 at 5, ¶ 30.)

The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) (per curiam). According to the Eleventh Circuit, "the defense of qualified immunity should be resolved at the earliest possible procedural moment." Amnesty Int'l v. Battle, 559 F.3d 1170, 1179 (11th Cir. 2009). The "driving force" behind the defense of qualified immunity is the desire "that 'insubstantial claims' against government officials be resolved **prior to discovery and on summary judgment** if possible." Anderson v. Creighton, 483 U.S. 635, 640 n.2, 107 S. Ct. 3034, 3039 n.2 (1987) (emphasis added).

### b.    The Plaintiff's Burden

"A governmental official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). "One who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial." Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting Gossett v. Du-Ra-Kel Corp., 569 F.2d 869, 872 (5th Cir. 1978)).

"Assuming the government official demonstrates that he was acting within his discretionary function, the plaintiff then bears the burden to overcome qualified immunity." Rushing v. Parker, 599 F.3d 1263, 1265 (11th Cir. 2010). "To defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a

fact-finder to find that no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993). The plaintiff cannot produce such evidence.

In this case, Mr. Stokes was a suspect in an attempted nighttime burglary of an occupied dwelling. (Doc. 9-1 at 1, ¶ 3.) When Officer Dodson tried to speak to Mr. Stokes, Mr. Stokes attacked Officer Dodson's throat twice. (Doc. 9-1 at 2, ¶ 7.) Mr. Stokes fled from Officer Dodson. (Doc. 9-1 at 2, ¶ 8.) From Officer Dodson's perspective, Mr. Stokes posed a threat to assault anyone with whom he might come in contact. (Doc. 9-1 at 4, ¶ 17.) There was also a risk that Mr. Stokes might break into someone else's home to seek refuge from the police, considering that he had already reportedly tried to enter one home. (Doc. 9-1 at 1, ¶ 3.)

It is the plaintiff's burden to demonstrate that on April 5, 2011, it was clearly established in the Eleventh Circuit that a police officer could not use a canine to apprehend a suspect under these circumstances. See Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) ("Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate."). "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional

right, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (internal citations omitted).

Courts are sometimes tempted to default to the "broad statement of principle" level of analysis when a plaintiff fails to provide sufficient factual detail for an evaluation under the "indistinguishable facts" standard. "The Supreme Court, however, has emphasized that the inquiry into whether the law is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Robinson v. Arrugueta, 415 F.3d 1252, 1256-57 (11th Cir. 2005) (quoting Brosseau v. Haugen, 543 U.S. 194, 599, 125 S. Ct. 596, 599 (2004)). Officer Dodson objects to any attempt to invoke the "broad statement of principle" standard to strip him of qualified immunity.

In Saucier v. Katz, the Supreme Court wrote, "there is no doubt that Graham v. Connor clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. *Yet that is not enough.*" 533 U.S. 194, 202 (2001) (emphasis added).

The Supreme Court "ha[s] repeatedly told courts … not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2084 (2011). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help

in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2084 (2011).

The Eleventh Circuit has also rejected the "broad statement of principle" approach for cases in which the reasonableness of an officer's conduct depends upon the factual context in which it occurred:

> The line between lawful and unlawful conduct is often vague. Harlow's "clearly established" standard demands that a bright line be crossed. The line is not found in abstractions – to act reasonably, to act with probable cause, and so on – but in studying how these abstractions have been applied in concrete circumstances. If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.

Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) (referring to Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982)).

In Vinyard v. Wilson, the Eleventh Circuit explained the limited circumstances in which the "broad statement of principle" standard applies:

> Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then turn to case law. When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. See Marsh, 268 F.3d at 1031-32 n.9. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying that determination to a particularized set of facts*, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, *the precise facts surrounding "X Conduct" are immaterial to the violation*. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a

> specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

311 F.3d 1340, 1351 (11th Cir. 2002) (emphasis added).  In short, <u>Vinyard</u> holds that "broad statement of principle" analysis is only appropriate for cases in which the challenged police conduct would be unlawful under any set of facts.

In <u>Grider v. City of Auburn</u>, the Eleventh Circuit confirmed that, "broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." 618 F.3d 1240, 1267 n.39 (11th Cir. 2010) (quoting <u>Vinyard</u>, 311 F.3d at 1351). In this case, the plaintiff has not alleged the sort of police conduct that would be unreasonable under any circumstances.  <u>See</u>, <u>e.g.</u>, <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (inmates chained to hitching posts).

Instead of invoking a broad statement of principle, the plaintiff must identify pre-existing case law with materially similar facts that would have placed every officer on notice that the particular use of force was unlawful.  <u>See Pace v. Capobianco</u>, 283 F.3d 1275, 1283 (11th Cir. 2002) ("We look for cases in which Fourth Amendment violations have been ascertained; and we look for fair warning, by studying *whether the cases involved facts materially similar to those in this case*: cases not fairly distinguishable from the case at hand.") (emphasis added).  In light of the Eleventh Circuit's holdings in its canine apprehension cases, the plaintiff cannot meet her burden.

39

c.     The Eleventh Circuit's Canine Apprehension Cases

Three reported decisions by the Eleventh Circuit address canine apprehensions by the police: <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919 (11th Cir. 2000), <u>Crenshaw v. Lister</u>, 556 F.3d 1283 (11th Cir. 2009), and <u>Edwards v. Shanley</u>, 666 F.3d 1289 (11th Cir. 2012).

In <u>Priester v. City of Riviera Beach</u>, the Eleventh Circuit denied qualified immunity to a police canine handler and his supervisor because they allowed a police dog to attack the plaintiff for at least two minutes.  208 F.3d 919, 927 (11th Cir. 2000).  When the plaintiff kicked the dog away from him, one of the officers drew his gun, pointed it at the plaintiff's head, and said, "You kick him again, and I will blow your mother fucking brains out." <u>Id.</u> at 923.  Unlike Mr. Stokes, the plaintiff in <u>Priester</u> never fled from the officers or attacked them, but instead complied with their commands.  <u>Id.</u>  During the attack, the plaintiff suffered fourteen puncture wounds on his legs.  <u>Id.</u> at 924.  The Eleventh Circuit held that "[n]o reasonable police officer could believe that this force was permissible." <u>Id.</u> at 927.

Mr. Stokes' situation was far different than that of the plaintiff in <u>Priester</u>.  Whereas the plaintiff in <u>Priester</u> was compliant, Mr. Stokes attacked Officer Dodson, disobeyed Officer Dodson's commands, and fled from Officer Dodson.  (Doc. 9-1 at 2-3, ¶¶ 7-12.)  Whereas the plaintiff in <u>Priester</u> suffered fourteen puncture wounds, Mr. Stokes only suffered scratches and abrasions. (Doc. 9-1 at 4, ¶ 15.)  Moreover, Officer Dodson did not allow his dog to attack

40

Mr. Stokes at any point after Mr. Stokes stopped resisting.  (Doc. 9-1 at 3-4, ¶¶ 14-16.)

In Crenshaw v. Lister, the Eleventh Circuit granted qualified immunity to a canine handler and a fellow sheriff's deputy after a canine was used to apprehend a fleeing armed robbery suspect.  556 F.3d 1283, 1285 (11th Cir. 2009).  The plaintiff in Crenshaw claimed he received thirty-one dog bites after he announced his intent to surrender.  Id. at 1285-86.  The plaintiff also claimed that the canine handler did not issue any warning before he sent the dog to apprehend the plaintiff.  Id. at 1285-86.  The plaintiff's apprehension occurred in "thick brush," id. at 1292, and during hours of darkness.  Id. at 1291.  The plaintiff claimed the deputies allowed the dog attack to continue until the plaintiff was handcuffed.  Id.  The district court denied qualified immunity for the deputies.  Id. at 1288.  The Eleventh Circuit reversed.  Id. at 1294.

The Eleventh Circuit held it was objectively reasonable for the deputies to use a canine to locate and apprehend the plaintiff.  Crenshaw, 556 F.3d at 1292.  The court noted that the plaintiff was a suspected armed robber who "actively fled from the police" and "attempted to hide in a densely wooded area." Id.  The court even accepted the plaintiff's claim that he attempted to surrender:

> Even assuming, as we must, that Crenshaw was legitimately attempting to surrender, it was objectively reasonable for Lister to question the sincerity of Crenshaw's attempt to do so and use the canine to apprehend him.  Lister was not required to risk his own life by revealing his position in an unfamiliar wooded area at night

41

to an armed fugitive who, up to that point, had shown anything but an intention of surrendering.

Crenshaw, 556 F.3d at 1293.

The Eleventh Circuit also was not swayed by the plaintiff's argument that the deputy allowed the dog to continue to bite the plaintiff until the plaintiff was handcuffed:

> Crenshaw pointed out below that Lister did not call off the canine until he had handcuffed Crenshaw. However, as just discussed, Lister reasonably believed that Crenshaw was armed and dangerous. Thus, unlike the officer in Priester, Lister would have been placing himself at risk had he called off the canine before ensuring that Crenshaw was fully secured. This is true regardless of whether Crenshaw was actively resisting arrest at that point, as Lister had no reason to trust that Crenshaw would not suddenly attempt to do him harm.

Crenshaw, 556 F.3d at 1293.

By comparison, Mr. Stokes was also a fleeing suspect in a reported attempted felony. (Doc. 9-1 at 1, ¶ 3.) Although Mr. Stokes was not reported to be armed, the target of his reported burglary attempt was a dwelling house, (Doc. 9-1 at 1, ¶ 3), and Mr. Stokes attacked Officer Dodson's throat twice. (Doc. 9-1 at 2, ¶ 7.) As in Crenshaw, the incident occurred during hours of darkness. (Doc. 9-1 at 1, ¶ 3.) As in Crenshaw, the final apprehension occurred in heavy brush. (Doc. 9-1 at 3, ¶ 13.) Based on the Eleventh Circuit's holding in Crenshaw, Officer Dodson reasonably could have believed that the use of a canine to apprehend Mr. Stokes was justified under the Fourth Amendment.

There are two notable differences between Mr. Stokes's case and Crenshaw. The plaintiff in Crenshaw suffered thirty-one dog bites, see

42

Crenshaw, 556 F.3d at 1285-86, whereas Mr. Stokes only suffered scratches and abrasions.  (Doc. 9-1 at 4, ¶ 15.)  Also, Officer Dodson recalled his dog before Mr. Stokes was even handcuffed, (Doc. 9-1 at 3, ¶ 13), whereas the deputy in Crenshaw allowed his dog to continue to attack the plaintiff until the plaintiff was handcuffed.  See Crenshaw, 556 F.3d at 1293.  Thus, Officer Dodson used greater restraint than the canine handler whose actions the Eleventh Circuit found reasonable in Crenshaw.

In Edwards v. Shanley, a police officer used a canine to subdue a non-serious traffic offender who fled a traffic stop.  666 F.3d 1289, 1292-93 (11th Cir. 2012).  The plaintiff claimed he surrendered to the officers before the first bite occurred.  Id. at 1293.  The plaintiff claimed the handler allowed his dog to bite the plaintiff for five to seven minutes, even though the plaintiff was not resisting.  Id.  The plaintiff claimed the officer did not recall his dog until after the plaintiff was handcuffed.  Id.  The apprehension occurred in thick brush.  Id.  The incident occurred during evening hours.  Id. at 1292-93.

The plaintiff suffered "significant damage to his leg's muscles and tendons resulting from a very, very complex injury that included the loss of a large area, large chunks of full-thickness tissue along his leg."  Edwards, 666 F.3d at 1294 (internal punctuation omitted).  The plaintiff "received urgent surgery and was required to remain in the hospital for six days, and upon release underwent extensive follow-up care."  Id. (internal punctuation omitted).  The district court granted qualified immunity to the officers.  Id.  The Eleventh Circuit reversed.  Id. at 1298.

43

Significantly, the Eleventh Circuit upheld the handler's decision to use a canine to apprehend the plaintiff in the first place.  See Edwards, 666 F.3d at 1295 ("we hold that Officer Shanley's decision to use a dog to help track and initially subdue the fleeing Edwards was constitutional").  However, the Eleventh Circuit held that "Officer Shanley used unconstitutionally excessive force when he permitted his dog to attack Edwards for five to seven minutes." Id.

The Eleventh Circuit explained that "the force necessarily caused by using a dog to track a fleeing suspect is reasonably tailored to the risk that a fleeing suspect presents."  Edwards, 666 F.3d at 1295.  According to the Eleventh Circuit, its holding in "Crenshaw at least precludes any conclusion that clearly established law prohibits the police from using a dog to track and subdue a fleeing suspect." Edwards, 666 F.3d at 1297.

However, the Eleventh Circuit held that "Officer Shanley used unreasonable force when he subjected Edwards to five to seven minutes of dog attack, while Edwards was pleading to surrender and Officer Shanley was in a position to immediately effect Edwards's arrest." Id. at 1296.

In contrast to Edwards, Officer Dodson recalled his dog each time it knocked Mr. Stokes to the ground as Mr. Stokes fled, (Doc. 9-1 at 2-3, ¶¶ 8-9), and at the point of final apprehension, Officer Dodson recalled his dog as soon as he got into position at Mr. Stokes' location, (Doc. 9-1 at 3, ¶ 13.)  Officer Dodson actually recalled his dog before backup officers arrived to place Mr. Stokes in handcuffs.  (Doc. 9-1 at 3, ¶ 13.)   Mr. Stokes' scratches and

44

abrasions were minor compared to the injuries that the Edwards plaintiff suffered.  (Doc. 9-1 at 4, ¶ 15.)

When the facts of Mr. Stokes' case are measured against the Eleventh Circuit's opinions in Priester, Crenshaw and Edwards, it is clear the Officer Dodson's use of his police dog to apprehend the plaintiff was reasonable under the Fourth Amendment.   Accordingly, Officer Dodson is entitled to qualified immunity against the Fourth Amendment excessive force claim.

### d.   The Fourth Amendment Reasonableness Analysis

The non-canine-apprehension use of force cases also support Officer Dodson's invocation of the qualified immunity defense.  "In analyzing whether excessive force was used, courts must look at the totality of the circumstances." Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280 (11th Cir. 2004).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).  "Government officials are not required to err on the side of caution." Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc).  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier v. Katz, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158 (2001).

"Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' however, its proper

application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989) (quoting Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884 (1979)).

In this case, the crime at issue was an attempted nighttime burglary of a dwelling. (Doc. 9-1 at 1, ¶ 3.)  Mr. Stokes posed an immediate threat to Officer Dodson by grabbing Officer Dodson's throat. (Doc. 9-1 at 2, ¶ 7.)  Mr. Stokes then attempted to evade arrest by flight. (Doc. 9-1 at 2-3, ¶¶ 7-12.)  Officer Dodson reasonably believed that Mr. Stokes posed a serious and imminent danger to himself, to other officers responding to this call, and to any members of the public with whom Mr. Stokes might come into contact. (Doc. 9-1 at 4, ¶ 17.)  All of the Graham factors weigh heavily in Officer Dodson's favor.

"Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred.  This is what we mean when we say we refuse to second-guess the officer." Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003) (citation omitted).  "We must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene.  We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." Smith v. Freland, 954 F.2d 343,

347 (6th Cir. 1992).  "We are loath to second-guess the decisions made by police officers in the field." Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003).

"From the vantage of an officer whose life is jeopardized, a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death." Menuel v. City of Atlanta, 25 F.3d 990, 995 (11th Cir. 1994).  "The excessive force inquiry provides a buffer for officers who are often acting on incomplete information and making split-second decisions." McCall v. Crosthwait, 590 F. Supp.2d 1337, 1345 (M.D. Ala. 2008) (Watkins, J.).  Officer Dodson was just trying to do his job and apprehend Mr. Stokes in response to a citizen's report of a burglary-in-progress. (Doc. 9-1 at 4, ¶ 17.)  Under these circumstances, Officer Dodson is entitled to the protection that qualified immunity affords.

### e.   The Mental Illness Factor

The complaint devotes several paragraphs to discussing Mr. Stokes' mental illness, (Doc. 1 at 3-4, ¶ 10-18), but Officer Dodson did not learn that Mr. Stokes is allegedly autistic until after Mr. Stokes was in custody and the incident was over.  (Doc. 9-2 at 4, p 16.)  Even if Officer Dodson had prior knowledge of Mr. Stokes' alleged mental illness, however, Officer Dodson's actions would still be justified.  The federal courts have recognized the potential lethality of mentally deranged assailants on numerous occasions:

> Very little mentation is required for deadly action.  A rattlesnake is deadly but could not form the mental state required for conviction of murder.  Whatever Pena's mental problems (apparently he was high on cocaine), they were not such as to prevent him from beating Leombruni's brains out with a chunk of concrete.

> Leoumbruni was entitled to defend himself whether or not Pena, had he assaulted him, and been prosecuted for the offense, would have been acquitted on the ground of insanity.

Pena v. Leombruni, 200 F.3d 1031, 1034 (7th Cir. 1999).

In Kesinger ex rel. Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004), the Eleventh Circuit held that a police officer's shooting of a deranged unarmed man did not violate the Fourth Amendment.

In Btesh v. City of Maitland, No. 6:10-cv-71-Orl-19DAB, 2011 WL 3269647, at *24 (M.D. Fla. July 29, 2011) (Fawsett, J.), aff'd, 471 F. App'x 883 (11th Cir. 2012), the United States District Court for the Middle District of Florida held that a police officer's shooting of a combative schizophrenic man did not violate the Fourth Amendment.

In Long v. Slaton, 508 F.3d 576, 580 (11th Cir. 2007), the Eleventh Circuit held that a police officer's fatal shooting of an unarmed mental patient did not violate the Fourth Amendment.  The Long decision is notable because in three places, the Eleventh Circuit cited Long's mental instability as a factor that weighed ***in favor of*** – not against – the deputy's decision to shoot:

- "Although at the point of the shooting Long had not yet used the police cruiser as a deadly weapon, ***Long's unstable frame of mind***, energetic evasion of the deputy's physical control, Long's criminal act of stealing a police cruiser, and Long's starting to drive – even after being warned of deadly force – to a public road gave the deputy reason to believe that Long was dangerous." Long, 508 F.3d at 581-82 (emphasis added).

- "But ***considering the unpredictability of Long's behavior*** and his fleeing in a marked police cruiser, "[w]e think the police need not have taken that chance and hoped for the best." Long, 508 F.3d at 583 (quoting Scott v. Harris, 550 U.S. 372, 385, 127 S. Ct. 1769, 1778 (2007)) (emphasis added).

48

- "In this case, unlike <u>Vaughan</u>, the fleeing driver was in ***an unstable frame of mind***, had taken possession of a marked police cruiser, and had been warned that deadly force would be used if he did not leave the cruiser." <u>Long</u>, 508 F.3d at 584.

In <u>Andrade v. Miami Dade County</u>, No. 09-23220-CIV, 2011 WL 4345665, at *5 (S.D. Fla. Sept. 16, 2011) (Lenard, J.), the United States District Court for the Southern District of Florida held that a police officer's shooting of a psychotic man did not violate the Fourth Amendment.

In <u>Humphrey v. City of Headland</u>, No. 1:12-cv-366-WHA, 2012 WL 2568206, at *5 (M.D. Ala. July 2, 2012) (Albritton, J.), Judge Albritton granted qualified immunity to an officer who fatally shot an allegedly unarmed schizophrenic man.  Judge Albritton explained that the man "was wandering around other residences where he could have posed a danger to the public by acting in the same combative way he did with the paramedics.  Moreover, had [the man] become combative with [the officer] and obtained [the officer's] weapon, the public, the paramedics, and [the officer] could have been in grave danger." <u>Id.</u> at *5.

In contrast to the mentally ill suspects who were shot with firearms in each of these examples, Mr. Stokes only suffered scratches and abrasions during his apprehension.  (Doc. 9-1 at 4, 15.)  Clearly, courts in the Eleventh Circuit have upheld much more significant levels of force against mentally ill suspects who posed a risk of serious physical harm to officers and others.

### 6.   *The Fourth Amendment False Arrest Claim*

For the reasons explained in the analysis of the unreasonable seizure claim, Officer Dodson is also entitled to qualified immunity on the Fourth Amendment false arrest claim.  "Actual probable cause is not necessary for an arrest to be objectively reasonable." Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990).  "To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010).

"Showing arguable probable cause does not, however, require proving every element of a crime." Brown v. City of Huntsville, 608 F.3d 724, 735 (11th Cir. 2010).  Also, formal prosecution is unnecessary.  See Knight v. Jacobson, 300 F.3d 1272, 1275 (11th Cir. 2002) ("Knight was never convicted or even prosecuted for that crime or any other stemming from the arrest, but that does not matter.").

"If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." Brown v. City of Huntsville, 608 F.3d 724, 735 (11th Cir. 2010).  "The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." Bailey v. Board of County Comm'rs of Alachua County, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992).

The complaint, itself, establishes arguable probable cause to arrest Mr. Stokes for Criminal Trespass in the Third Degree under Alabama Code § 13A-7-4 (1975).  (Doc. 1 at 4, ¶ 21.)  Therefore, the complaint does not state a Fourth Amendment false arrest claim upon which relief can be granted, and

Officer Dodson is entitled to dismissal based on the qualified immunity defense.

When Officer Dodson's affidavit is considered on the summary judgment motion, there is ample evidence of arguable probable cause for a list of crimes:

- Attempted Burglary in the Third Degree under Ala. Code § 13A-7-7 (1975);

- Obstructing Governmental Operations under Ala. Code § 13A-10-2 (1975);

- Harassment under Alabama Code § 13A-11-8 (1975);

- Assault in the Second Degree under Alabama Code § 13A-6-21(a)(4) (1975);

- Criminal Trespassing in the Second Degree under Alabama Code § 13A-7-3 (1975);

- Resisting Arrest under Alabama Code § 13A-10-41 (1975); and

- Fleeing or Attempting to Elude a Law Enforcement Officer under Alabama Code § 13A-10-52 (1975).

For example, in A.A.G. v. State, the Alabama Court of Criminal Appeals held there was sufficient evidence to support the defendant's conviction for Obstructing Governmental Operations when she struggled to run away from officers who were investigating a residential burglary alarm.  668 So. 2d 122, 128 (Ala. Crim. App. 1995).

Accordingly, Officer Dodson moves to dismiss the Fourth Amendment false arrest claim based on the qualified immunity defense.  Officer Dodson also moves for summary judgment on the Fourth Amendment false arrest claim based on the qualified immunity defense.

### 7.    The Fourteenth Amendment Due Process Claim

Count Three also asserts a Fourteenth Amendment due process claim based on Mr. Stokes' arrest.  (Doc. 1 at 8, ¶ 46)  However, a Fourteenth Amendment due process claim is not viable for an arrest in the field.  See Albright v. Oliver, 510 U.S. 266, 274-75, 114 S. Ct. 807, 813-14 (1994) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."); see also U.S. Steel, L.L.C. v. Tieco, Inc., 261 F.3d 1275 (11th Cir. 2001) (holding plaintiff "has no right under the substantive component of the Due Process Clause to be free from criminal prosecution without probable clause"); Cf. Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").  Accordingly, Officer Dodson moves to dismiss the Fourteenth Amendment due process claim in Count Three based on the qualified immunity defense.

### 8.    The Title II of the Americans with Disabilities Act Claim

Count Four alleges "Defendants failed to properly train its [sic] officers and therefore violated the ADA."  (Doc. 1 at 10, ¶ 56.)  Again, the complaint does not specifically identify the intended defendant.

a.    The ADA Claim Against Officer Dodson (If There Is One)

To the extent Count Four asserts an ADA claim against Officer Dodson, Officer Dodson moves to dismiss Count Four for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  Officer Dodson also moves to dismiss Count Four based on the qualified immunity defense.  See American Fed'n of Labor and Cong. of Indus. Orgs. v. City of Miami, 637 F.3d 1178, 1185 (11th Cir. 2011) ("A government official is entitled to qualified immunity if, under the facts as alleged, his conduct did not violate a clearly established statutory or constitutional right of which a reasonable person would have known.").

The body of Count Four does not identify the specific statutory provision on which this claim is based.  (Doc. 1 at 9-10, ¶¶ 50-60.)  However, the caption refers to 42 U.S.C. § 12132.  (Doc. 1 at 9.)  Section 12132 states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of **a public entity**, or be subjected to discrimination by any **such entity**."  42 U.S.C. § 12132 (Westlaw 2013) (emphasis added).  Officer Dodson is not a "public entity."

"It is settled that Title II of the ADA does not permit individual capacity suits."  Smith v. Rainey, 747 F. Supp. 2d 1327, 1340 (M.D. Fla. 2010) (Whittemore, J.).  In Badillo v. Thorpe, the United States Court of Appeals for the Eleventh Circuit held "there is no individual capacity liability under Title II of the ADA."  158 F. App'x 208, 211 (11th Cir. 2005).  In Rylee v. Chapman, the

53

Eleventh Circuit held that arresting officers could not be individually liable under Title II of the ADA.  316 F. App'x 901, 905 (11th Cir. 2009) ("By its terms, the ADA only addresses discrimination by a 'public entity.'").

Based on these authorities, Officer Dodson moves to dismiss Count Four for failure to state a claim upon which relief can be granted and based on the qualified immunity defense.

>            b.    The ADA Claim Against the City of Ozark

The City of Ozark moves to dismiss the ADA claim in Count Four for failure to state a claim upon which relief can be granted.  <u>See</u> Fed. R. Civ. P. 12(b)(6).  The City of Ozark also moves for summary judgment on the ADA claim in Count Four.  <u>See</u> Fed. R. Civ. P. 56.

The leading reported ADA decision in the Eleventh Circuit on the subject of arrests is <u>Bircoll v. Miami-Dade County</u>, 480 F.3d 1072 (11th Cir. 2007).  In <u>Bircoll</u>, a Miami-Dade police officer arrested a deaf motorist for DUI after a traffic stop.  <u>Id.</u> at 1076-78.  After his DUI charge was *nolle prossed*, the motorist sued Miami-Dade County under Title II of the Americans with Disabilities Act.  <u>Id.</u> at 1080.  The Eleventh Circuit noted, "This case presents an issue of first impression in this circuit as to the applicability of the ADA . . . to police conduct during arrests."  <u>Id.</u> at 1075.

Although the Fifth Circuit had previously held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is

no threat to human life," Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000), the Eleventh Circuit took a different approach.  See Bircoll, 480 F.3d at 1084-85.

The Eleventh Circuit divided § 12132 into two parts.  See Bircoll, 480 F.3d at 1084-85.  The first part prohibits a public entity from excluding a qualified individual with a disability from participating in, or receiving the benefits of, services, programs or activities of the public entity based on the disability.  See 42 U.S.C. § 12132 (Westlaw 2013).  The second part prohibits a public entity from subjecting a qualified individual with a disability to discrimination based on the disability:

> We need not enter the circuits' debate about whether police conduct during an arrest is a program, service, or activity covered by the ADA.  This is because Bircoll, in any event, could still attempt to show an ADA claim under the final clause in the Title II statute: that he was "subjected to discrimination" by a public entity, the police, by reason of his disability.

Bircoll, 480 F.3d at 1084.

The Eleventh Circuit explained "that this final clause in Title II is a catch-all phrase that prohibits all discrimination by a public entity, regardless of context." Bircoll, 480 F. 3d at 1085 (quoting Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816, 822 (11th Cir. 1998) (internal punctuation omitted)).  "In our view, the question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of Bircoll's disability." Bircoll, 480 F.3d at 1085.  Rather, "[t]he exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the

requested ADA modification than whether the ADA applies in the first instance." Id.

"In other words, the question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety." Bircoll, 480 F. 3d at 1085. "The reasonable modification inquiry in Title II-ADA is 'a highly fact-specific inquiry.'" Id. (quoting Holbrook v. City of Alpharetta, 112 F.3d 1522, 1527 (11th Cir. 1997)).

The Eleventh Circuit emphasized that "terms like reasonable are relative to the particular circumstances of the case and the circumstances of a DUI arrest on the roadside are different from those of an office or school or even a police station." Bircoll, 480 F.3d at 1086.   The Eleventh Circuit then considered the plaintiff's claim that he requested an interpreter at the scene of his traffic stop and that his request was denied. Id. at 1085-87.

The Eleventh Circuit held as a matter of law that "field sobriety tests in DUI arrests involve exigencies that necessitate prompt action for the protection of the public and make the provision of an oral interpreter to a driver who speaks English and can read lips ***per se not reasonable***." Id. at 1086 (emphasis added).

Mr. Stokes' situation is not nearly as close a case as Bircoll.  In this case, Mr. Stokes violently resisted detention and fled.  (Doc. 9-1 at 2-4, ¶¶ 7-14.)  In

Bircoll, there was no physical struggle, and Bircoll's threat to the public as a suspected drunk driver was mitigated once the police officer pulled him over.

There also is no allegation or evidence that Mr. Stokes ever requested an accommodation of any sort.  To the contrary, the complaint alleges that Mr. Stokes is "completely non-verbal, having no communication skills."  (Doc. 1 at 3, ¶ 11.)  Therefore, Officer Dodson was not even confronted with a request for an accommodation like the officer in Bircoll.

If refusing a compliant deaf motorist's request for an interpreter during a traffic stop is reasonable as a matter of law, then Officer Dodson's failure to modify his response to Mr. Stokes' violent resistance in response to a disability that Officer Dodson did not even know existed must also be reasonable as a matter of law.  (Doc. 9-1 at 4, ¶ 16.)

Not only was any accommodation of Mr. Stokes' disability "per se not reasonable" while he was resisting Officer Dodson, but there is also no evidence of intentional discrimination in this case.  Officer Dodson has testified by affidavit that he did not learn that Mr. Stokes was reportedly autistic until after Mr. Stokes was in custody and the incident was over.  (Doc. 9-1 at 4, ¶ 16.) Under these circumstances, Officer Dodson could not possibly have discriminated against Mr. Stokes on the basis of his alleged disability.  See Bircoll v. Miami-Dade County, 480 F.3d 1072, 1083 (11th Cir. 2007) ("In order to state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or

was otherwise discriminated against by the public entity; and (3) *that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability*.) (emphasis added).

To the extent the complaint criticizes the training provided by the City of Ozark, it does not plausibly demonstrate how different or better training would have produced a different result in this case.   (Doc. 1 at 9-10, ¶¶ 50-60.) Therefore, the element of causation is lacking.   See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557-58 (2007) ("something beyond the mere possibility of loss causation must be alleged, less a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'").

Based on the foregoing, the City of Ozark moves to dismiss, and for summary judgment on, the ADA claim in Count Four.   See Fed. R. Civ. P. 12(b)(6) & 56.

### 9.    *The State Law Negligence Claims Against the City of Ozark*

Count Five of the complaint asserts state law claims against the City of Ozark for negligent hiring, training and supervision.   (Doc. 1 at 11-12, ¶¶ 62-64.)   These claims are barred by municipal immunity under Alabama Code § 11-47-190 (1975).   Except for claims arising from premises defects, a *direct* tort action will not lie against a municipality:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty, or unless the said injury or wrong was done or suffered through the neglect or carelessness or failure to remedy some defect in the streets, alleys, public ways or buildings . . . .

Ala. Code § 11-47-190 (1975).

In construing section 11-47-190's predecessor, which was substantially identical, the Alabama Supreme Court held, "It seems to us that the limitation of liability in that statute necessarily means to exclude liability on any other account." City of Bessemer v. Chambers, 8 So. 2d 163, 165 (Ala. 1942).

In City of Lanett v. Tomlinson, the Alabama Supreme Court confirmed that interpretation of the modern statute:

> This Court has long interpreted § 11-47-190 to limit municipal liability to two distinct classes.  The municipality may be liable (1) under the doctrine of respondeat superior for injuries that result from the wrongful conduct of its agents or officers in the line of duty.  The municipality may also be liable (2) for injuries that result from its failure to remedy conditions created or allowed to exist on the streets, alleys, or public ways by a person or corporation "not related in service" to the municipality.

City of Lanett v. Tomlinson, 659 So. 2d 68, 70 (Ala. 1995).

Consistent with the foregoing analysis, the Alabama Supreme Court and the United States District Courts in Alabama have rejected direct negligence claims against municipalities in circumstances like this.

In City of Crossville v. Haynes, the Alabama Supreme Court held the plaintiff could not bring a direct claim against the city for negligent training. 925 So. 2d 944, 956 (Ala. 2005) ("Haynes was not entitled to assert a 'direct'

59

claim against the City of Crossville under § 11-47-190."). The Alabama Supreme Court held the city was entitled to a judgment as a matter of law and reversed a jury award for the plaintiff. Id.

In Styron v. City of Foley, Judge Granade of the United States District Court for the Southern District of Alabama held, "Alabama does not recognize an action against a municipality for negligent hiring, supervising, or training." No. 03-572-CG-L, 2005 WL 3098926, at *4-5 (S.D. Ala. Nov. 18, 2005) (Granade, C.J.). Judge Butler reached the same holding in Ott v. City of Mobile, 169 F. Supp.2d 1301, 1314-15 (S.D. Ala. 2001) (Butler, C.J.) (holding direct action will not lie against municipality for negligent training of police officer). Judge Watkins reached the same holding in Cornelius v. City of Andalusia, No. 2:06-cv-312-WKW, 2007 WL 4224036, at *5 (M.D. Ala. Nov. 28, 2007) ("Alabama courts have not recognized a cause of action against a municipality for negligent training.").

In light of section 11-47-190, a plaintiff may not assert a direct claim against a municipality for negligent hiring, training or supervision. Accordingly, the City of Ozark moves to dismiss these claims based on the statutory immunity defense provide by § 11-47-190.

### 10.   *The State Law Assault and Battery Claims*

Counts Eight and Nine assert state law assault and battery claims against "the Defendants." (Doc. 1 at 13-14, ¶¶ 72-79.)

a.    The Assault and Battery Claims Against the City

Because the complaint is not carefully worded, it actually alleges that the City, itself, engaged in "intentional attempts to do harm to the Plaintiff," (Doc. 1 at 13, ¶ 74), and "made intentional, unlawful, and harmful physical contact with Plaintiff."  (Doc. 1 at 13, ¶ 78.)  A city cannot form an intent or engage in physical contact.   In any event, these claims are barred by the statutory immunity defense conferred by Alabama Code § 11-47-190:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the **neglect, carelessness or unskillfulness** of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty, or unless the said injury or wrong was done or suffered through the neglect or carelessness or failure to remedy some defect in the streets, alleys, public ways or buildings . . . .

Ala. Code § 11-47-190 (1975) (emphasis added).

"Intentional tort claims cannot be brought against municipalities." Romero v. City of Clanton, 220 F. Supp. 2d 1313, 1319 (M.D. Ala. 2002) (Albritton, J.); see also Brown v. City of Huntsville, 608 F.3d 724, 743 (11th Cir. 2010) (holding city not liable for intentional torts of employees).

"[U]nder § 11-47-190, a municipality is immune from liability for the intentional torts of its agents."  Ex parte City of Tuskegee, 932 So. 2d 895, 911 (Ala. 2005); see also Borders v. City of Huntsville, 875 So. 2d 1168, 1183 (Ala. 2003) ("Section 11-47-190 absolves a city from liability for an intentional tort committed by one of its agents.").

Based on the immunity defense under § 11-47-190, the City of Ozark moves to dismiss the state law assault and battery claims in Counts Eight and Nine.

### b.   The Assault and Battery Claims Against Officer Dodson

Pursuant to Alabama Code § 6-5-338, Officer Dodson invokes the state-agent immunity defense against the state law assault and battery claims in Counts Eight and Nine.  (Doc. 1 at 13-14, ¶¶ 72-79.)  Officer Dodson moves for summary judgment on these claims.

According to § 6-5-338:

(a) Every peace officer … shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

(b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers.

Ala. Code § 6-5-338 (1975).

"Cranman's test for state-agent immunity governs whether law enforcement officers are entitled to statutory, discretionary function immunity under § 6-5-338(a)."  Brown v. City of Huntsville, 608 F.3d 724, 741 (11th Cir. 2010) (referring to Ex parte Cranman, 792 So. 2d 392 (Ala. 2000)).  "[T]he availability of State-agent immunity is . . . a question of law to be determined by the court."  Suttles v. Roy, 75 So. 3d 90, 100 (Ala. 2010).

As later modified by Hollis v. City of Brighton, the Cranman standard states:

A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

> (1) formulating plans, policies, or designs; or

> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

>> (a) making administrative adjudications;

>> (b) allocating resources;

>> (c) negotiating contracts;

>> (d) hiring, firing, transferring, assigning, or supervising personnel; or

> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

> (4) ***exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975***; or

> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

Ex parte Cranman, 792 So. 2d 392, 405 (Ala. 2000) (Category 4 modified by Hollis v. City of Brighton, 950 So. 2d 300, 309 (Ala. 2006) (emphasis added)).

"The [state-agent immunity defense] shields every defendant who (1) is a peace officer, (2) is performing law enforcement duties, and (3) is exercising judgment and discretion." Howard v. City of Atmore, 887 So.2d 201, 204 (Ala. 2003).

A police officer qualifies as a peace officer for purposes of § 6-5-338. See Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003) ("As a police officer, Earle qualifies as a peace officer for purposes of § 6-5-338."). "Under § 6-5-338, a law enforcement officer is entitled to State-agent immunity if the officer was performing a discretionary function." Swan v. City of Hueytown, 920 So. 2d 1075, 1078 (Ala. 2005).

"Discretionary functions are broadly defined as those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003). "If a public employee is required to decide and act without fixed or readily ascertainable standards, that act is a discretionary function." Swan v. City of Hueytown, 920 So. 2d 1075, 1080 n.6 (2005) (quoting Ex parte Alabama Dep't of Forensic Sciences, 709 So. 2d 455, 458 (Ala. 1997)).

"Generally, arrests and attempted arrests are classified as discretionary functions." Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003). An officer's decision about how much force to use during an arrest is also a discretionary function.  See City of Birmingham v. Sutherland, 834 So. 2d 755, 762 (Ala. 2002) ("he was performing a discretionary function when he chose to make a warrantless arrest and a discretionary function when he chose the manner in which he would effect the arrest"); Thurmond v. City of Huntsville, 904 So. 2d 314, 326 (Ala. Civ. App. 2004) ("we conclude that the ... officers were engaged in the exercise of a discretionary function ... when they made the judgment call on how much force to use and under what circumstances to use it").

The intentional use of force by a police officer in the course of his official duties does not equate to "willfulness" in the immunity context.  Otherwise, officers would be stripped of immunity every time they use force.  A review of the case law proves this point.

In Ex parte Kennedy, a member of the Alabama State Troopers' tactical team shot and killed an armed suspect during a standoff.  992 So. 2d, 1276 1278-79 (Ala. 2008).  The personal representative of the suspect's estate brought state law outrage and wrongful death claims against the trooper and his supervisors.  Id. at 1279.

The troopers moved for summary judgment based on the State-agent immunity defense under Alabama Code section 6-5-338.   See Ex parte Kennedy, 992 So. 2d at 1279.  The trial court granted the motion as to the

outrage claim, but denied it as to the wrongful death claim.  Id. at 1279.  The troopers petitioned the Alabama Supreme Court for a writ of mandamus directing the trial court to enter summary judgment based upon their immunity defenses.  Id.  The Alabama Supreme Court issued the writ.  Id. at 1286.

First, the Supreme Court held the troopers were engaged in a discretionary function during the incident:

> In the present case, we have no difficulty concluding that Trooper Kennedy, Lt. Ward, and Sgt. Griffin carried their burden of demonstrating that, at the times relevant to this matter, they were engaged in law-enforcement functions for which statutory and State-agent immunity would be available, barring the application of one of the two categories of exceptions to immunity recognized in Cranman.

Ex part Kennedy, 992 So. 2d at 1283.

Accordingly, the Supreme Court held the plaintiff "had the burden of demonstrating that an exception to State-agent immunity applied."  Ex parte Kennedy, 992 So. 2d at 1283.  Although the plaintiff argued that "the actions of the defendants [were] willful and malicious," he "fail[ed] to explain how this was so or to elaborate in any way on this legal conclusion" and the record "fail[ed] to support this bald assertion."  Id. at 1283 n.6.  Accordingly, the Supreme Court held the troopers were entitled to State-agent immunity and ordered the trial court to enter a summary judgment in their favor.[2]  Id.

---

[2] The Supreme Court also rejected the plaintiff's alternative argument that the officers exceeded their authority by failing to follow their training guidelines.  See Ex parte Kennedy, 992 So. 2d at 1286.

In <u>City of Birmingham v. Sutherland</u>, a plain clothes Birmingham police officer arrested the plaintiff by intentionally drawing his handgun, pointing it at the plaintiff, and instructing the plaintiff not to move.  834 So. 2d 755, 756 (Ala. 2002).  The plaintiff sued the officer for assault and battery.  <u>Id.</u>  The Alabama Supreme Court held the officer's conduct in intentionally pointing his handgun at the plaintiff did not constitute willfulness, because the arrest was lawful:

> Under these circumstances, we conclude that Officer Wooten had probable cause to believe that a felony had been committed and that Sutherland had committed it.  Thus, he was performing a discretionary function when he chose to make a warrantless arrest and a discretionary function when he chose the manner in which he would effect the arrest.  ***Sutherland further failed to specifically allege, or to present any evidence tending to prove, that Officer Wooten's actions were taken in bad faith, or that his conduct was willful or malicious.***

<u>Id.</u> at 762 (emphasis added).

In <u>Thurmond v. City of Huntsville</u>, the Alabama Court of Civil Appeals held that police officers were entitled to State-agent immunity against the plaintiffs' assault and battery claim, even though the officers deliberately struck the plaintiffs with batons.  904 So. 2d 314 (Ala. Civ. App. 2004).  In <u>Thurmond</u>, officers assigned to perform crowd control duties during an unruly labor union strike started marching toward the plaintiffs while swinging their police batons.  <u>Id.</u> at 317.  When the plaintiffs refused to disperse, the officers struck them with the batons.  <u>Id.</u>  The plaintiffs sued the officers for "negligent or intentional assault and battery."  <u>Id.</u> at 318.  The officers invoked the State-agent immunity defense under Alabama Code section 6-5-338.  <u>Id.</u> at 319.

The Court of Civil Appeals evaluated the State-agent immunity question much like the federal courts weigh qualified immunity:

> With regard to police officers performing their law-enforcement duties, our supreme court has stated that discretionary-function immunity must exist because a police officer should not be required "to ponder and ruminate over decisions that should be made in a split-second." White v. Birchfield, 582 So. 2d 1085, 1087 (Ala. 1991). Our supreme court has also stated that the grant of discretionary-function immunity is justified by "'[t]he need to attract and keep capable [police] officers, the allocation of scarce resources for law enforcement, and the need for officers to make decisions based on the requirements of the circumstances rather than on their potential for personal liability.'" Nunnelee v. City of Decatur, 643 So. 2d 543, 546 (Ala. 1993) (quoting Thetford v. City of Clanton, 605 So. 2d 835, 843 (Ala. 1992)). In addition, it has been held that the shield of discretionary-function immunity is "'particularly applicable'" where "'[a police] officer is required to make difficult decisions on the spur of the moment'" while performing his law-enforcement duties, Nunnelee, 643 So. 2d at 546 (quoting Thetford, 605 So. 2d at 843), and in situations where a police officer responds to a "life-threatening situation," Birchfield, 582 So. 2d at 1087. More recently, it has been held that discretionary-function immunity applies when a police officer is required to make "difficult split-second decision[s] under unusual circumstances." Ex parte Gadsden, 781 So. 2d at 940.

Thurmond, 904 So. 2d at 320.

The Court of Civil Appeals concluded the officers "were required to make decisions, on a split-second basis, as to the level of resistance offered by the plaintiffs and also had to use their independent judgment to determine what amount of force was appropriate under the circumstances to respond to such resistance." Thurmond, 904 So. 2d at 325. The Court of Civil Appeals declared the officers "were engaged in the exercise of a discretionary function on the occasion at issue when they made the judgment call on how much force to use and under what circumstances to use it." Id. at 326.

The Court of Civil Appeals held the officers "made a prima facie showing that the defense of discretionary-function immunity barred the plaintiffs' claims against them." Thurmond, 904 So. 2d at 326.  Turning to the plaintiffs' burden, the Court of Civil Appeals held, "The plaintiffs failed to rebut that prima facie showing by presenting evidence tending to show that the conduct of [the officers] was 'so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith.'" Id. (quoting Couch v. City of Sheffield, 708 So. 2d 144, 153 (Ala. 1998)).  In other words, the officers' deliberate baton strikes were not "willful," as that term is applied in the immunity context.

The United States Court of Appeals for the Eleventh Circuit applied the willfulness standard similarly in Brown v. City of Huntsville, 608 F.3d 724 (11th Cir. 2010).  In Brown, two police officers, Norris and Anderson, used force to effect the lawful arrest of plaintiff Joi Brown.  608 F.3d at 730-31.  Although Brown was compliant during the arrest process, Norris sprayed her with pepper spray, threw her out of a vehicle while holding her arm and hair, and slammed her onto the ground.  Id. at 730-31.  Anderson, on the other hand, merely assisted Norris by grabbing one of Brown's arms, pulling her out of the vehicle, and placing her on the ground.  Id. at 731.  Brown sued both officers for excessive force under § 1983 and for assault and battery under state law. The Eleventh Circuit's contrasting analysis of each officer's entitlement to immunity is enlightening.

As to Norris, the Eleventh Circuit found that his use of pepper spray against Brown while she was compliant violated clearly established law.

69

Brown, 608 F. 3d at 739.  "Under Brown's version, Norris's actions in effecting the arrest constitute excessive force."  Id.  The Eleventh Circuit extended its holding on the section 1983 qualified immunity issue to the state law immunity question: "Defendant Norris's use of pepper spray and other force against Plaintiff Brown was done intentionally, gratuitously, and *in violation of Plaintiff Brown's clearly established constitutional rights, supporting an inference that Norris acted willfully and in bad faith.*"  Id. at 742 (emphasis added).

On the other hand, the Eleventh Circuit held that Anderson's deliberate actions in grabbing Brown's arm, pulling her out of the vehicle, and placing her on the ground did not violate Brown's constitutional rights.  Brown, 608 F.3d at 740.  Accordingly, the Eleventh Circuit held that Anderson's conduct also did not amount to willfulness under state law: "In contrast, Defendant Anderson's use of force against Plaintiff Brown does not constitute a constitutional violation, and neither does it show the required willfulness, maliciousness, fraud, or bad faith necessary to deny Anderson state-agent and statutory, discretionary-function immunity."  Id. at 742.

The United States District Court for the Southern District of Alabama applied the willfulness standard to an officer-involved fatal shooting in Bullard v. City of Mobile, No. A. 00-0114-CB-M, 2000 WL 33156407 (S.D. Ala. Dec. 14, 2000) (Butler, C.J.).  In Bullard, a mentally deranged man armed himself with a knife and threatened a factory worker.  Id. at *1.  Bystanders called the police.  Id.  Several officers responded and confronted the suspect inside the factory.  Id. at *1-2.  When the suspect raised his knife and stepped toward a

70

police sergeant, the sergeant and a second officer shot and killed the suspect. Id. at *2.  The suspect's estate asserted a section 1983 excessive force claim under the Fourth Amendment and an assault and battery claim under state law.  Id.

The district court granted qualified immunity to the officers on the Fourth Amendment claim and granted State-agent immunity on the assault and battery claim.  Id. at *3-7.  As to the state law claim, the court wrote, "no evidence supports plaintiff's assertion that Graham and Jackson attacked or intentionally killed Bullard.  Rather, the evidence supports defendants' claims that Graham acted in self-defense and that Jackson acted in defense of Graham."  Id. at *7.  The court concluded, "Since there is no evidence of willfulness, maliciousness or bad faith and there is no dispute as to the discretionary nature of the defendants' actions, the Court finds that defendants Graham and Jackson are entitled to immunity from liability as to plaintiff's state law assault and battery claim."  Id. at *7.

In Bracewell v. Patrick, Chief United States District Court Judge Mark Fuller granted a police officer's motion to dismiss a state law assault and battery claim based on the State-agent immunity defense.  No. 1:10-cv-992-MEF, 2011 WL 1431521 (M.D. Ala. Apr. 14, 2011) (Fuller, C.J.).  The complaint alleged the officer deliberately used force against the plaintiff during the course of an arrest.  Id. at *1-2.  The complaint explicitly alleged that the officer used force "maliciously."  Id. at *7.  However, Judge Fuller wrote that the plaintiff

"included no facts whatsoever to support that conclusion." Id.  Judge Fuller explained:

> The use of force during the course of an arrest cannot alone demonstrate that Patrick's actions were malicious.  Bracewell's allegations do not allow the Court to draw the inference that Patrick was acting with malice.  Accordingly, he is entitled to state agent immunity, and the assault and battery claims against him are dismissed with prejudice.

Id. at *7.

According to the Alabama Supreme Court, "as a general rule, city officials are immune from suit unless they violate clearly established law." Ex parte City of Birmingham, 624 So. 2d 1018, 1021 (Ala. 1993) (quoted with approval in Gibson v. City of Alexander City, 779 So. 2d 1153, 1156 (Ala. 2000)). Indeed, in Walker v. Huntsville the Alabama Supreme Court held that a federal court's determination that an officer's use of force was reasonable under the Fourth Amendment collaterally estopped the plaintiff from prosecuting a battery claim under state law.  62 So. 3d 474, 494 (Ala. 2010).

In this case, Officer Dodson did not harbor any animosity or ill will toward Mr. Stokes.  (Doc. 9-1 at 4, ¶ 17.)  To the best of Officer Dodson's knowledge, he had never seen Mr. Stokes before that night.  (Doc. 9-1 at 4, ¶ 16.)  Officer Dodson did not learn that Mr. Stokes was reportedly autistic until after he was in custody and the incident was over.  (Doc. 9-1 at 4, ¶ 16.) Officer Dodson was just trying to do his job and detain Mr. Stokes in response to a citizen's report of a burglary-in-progress.  (Doc. 9-1 at 4, ¶ 17.)  Based on Mr. Stokes' attempts to grab Officer Dodson's throat and the initial report that Mr. Stokes tried to enter someone's home, Officer Dodson believed Mr. Stokes

posed a serious and imminent danger to himself, to other officers responding to that call, and to any members of the public with whom Mr. Stokes might come into contact.  (Doc. 9-1 at 4, ¶ 17.)

In sum, there is no evidence of bad faith, ill will or malice on the part of Officer Dodson.  Accordingly, Officer Dodson moves for summary judgment on the state law assault and battery claims in Counts Eight and Nine based on the State-agent immunity defense under Alabama Code § 6-5-338 (1975).

c.   Municipal Immunity Under § 6-5-338(b)

The City of Ozark also invokes State-agent immunity against the state law assault and battery claims under Alabama Code § 6-5-338(b) (1975).  "It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune."  Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003); see also Brown v. City of Huntsville, 608 F.3d 724, 742 (11th Cir. 2010) ("In cases such as this where the 'municipal employee' is a law enforcement officer, Alabama's statutory, discretionary function immunity explicitly extends an officer's immunity to the employing municipality.")  (citing Ala. Code § 6-5-338(b) (1975)).  Based on State-agent immunity under § 6-5-338(b), the City of Ozark also moves for summary judgment on the state law assault and battery claims in Counts Eight and Nine.

## VI.  CONCLUSION

For the foregoing reasons, the City of Ozark and Officer Dodson move to dismiss all claims except the Fourth Amendment excessive force claim against Officer Dodson and the state law assault and battery claims against Officer Dodson.  The City of Ozark and Officer Dodson move for summary judgment on all claims, including the Fourth Amendment excessive force claim against Officer Dodson and the state law assault and battery claims against Officer Dodson.


**s/ James H. Pike**
James H. Pike (PIK003)
Attorney for Defendants
The City of Ozark and Officer Phil Dodson


OF COUNSEL:

SHEALY, CRUM & PIKE, P.C.
P.O. Box 6346
Dothan, Alabama  36302-6346
Tel. (334) 677-3000
Fax (334) 677-0030
Email: jpike@scplaw.us

## CERTIFICATE OF SERVICE

I, James H. Pike, certify that on March 12, 2013, I electronically served this document, via the CM/ECF system, upon:

Tiffany Johnson Cole
Robert Simms Thompson
LAW OFFICES OF ROBERT SIMMS THOMPSON, P.C.
P.O. Box 830780
Tuskegee, Alabama  36083

**s/ James H. Pike**
James H. Pike