IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SPRING GARNER, as parent and next friend of Wynter Stokes, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:13-CV-90-WKW |
| CITY OF OZARK, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Defendants' motion for summary judgment on Counts One, Eight, and Nine against Officer Dodson in his individual capacity, and Count Four against the City of Ozark.  (Docs. # 8, 9.)  Plaintiff's other claims have been resolved in Defendants' favor.  (*See* Docs. # 31, 45.)  Per the directive of the Eleventh Circuit, Plaintiff's Rule 56(d) motion for discovery has been denied.  (*See* Doc. # 43.)  Plaintiff has been allowed additional time to respond to the motion for summary judgment (*see* Doc. # 45), but she has not supplemented her original responses (*see* Docs. # 23, 26), which primarily respond to separate motions to dismiss and for reconsideration.  Upon consideration of Defendants' motion for summary judgment, the record, and relevant law, the court concludes that the motion is due to be granted.

# I.  JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343.  Personal jurisdiction and venue are uncontested.

# II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry

2

its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.   A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND

**A.** <u>**Facts**</u>

Plaintiff Spring Garner is the mother and legal guardian of her incompetent son, Wynter Stokes, who is autistic and "completely non-verbal."  (Compl. at ¶¶ 2, 11.)  Plaintiff brings this suit as parent and next friend of Wynter.  At the time of the events at the basis of this suit, Wynter was eighteen years old.  Plaintiff and her son live in Ozark, Alabama.  Defendant Officer Phil Dodson is employed by the City of Ozark as a policeman who works with a police dog.

According to the Complaint, on the evening of April 5, 2011, Wynter left home without his mother's knowledge and wandered to Eufaula Street in Ozark where he wound up at the Brasher residence.  Mrs. Brasher notified the Ozark police that someone (Wynter) was in their yard and would not acknowledge her when spoken to or asked to leave.  Officer Dodson is alleged to have arrived "on the scene" (Compl., at ¶ 22), although this is false, according to Officer Dodson's

unrefuted testimony.   Another unidentified "white male officer" met with Mr. Brasher who reported to that officer that the suspicious person had been on the porch and was unarmed.  (Compl. at ¶ 23.)  Mr. Brasher allegedly told the officer with whom he spoke that the person who had been on his property was "different" and possibly autistic.  (Compl. at ¶ 23.)

The allegations concerning Mr. Brasher's statements to police are unsupported by any evidence.  Yet Plaintiff's Complaint assumes that Officer Dodson knew that Wynter was possibly autistic when he encountered Wynter and commanded his canine to attack Wynter multiple times, allegedly without provocation or cause.  (Compl. at ¶¶ 30–33.)  Plaintiff alleges that Officer Dodson could have restrained Wynter with handcuffs, eliminating the need to repeatedly command the canine to attack.  As a result of the canine apprehension, Wynter suffered injuries requiring medical treatment and has endured emotional distress and trauma.[1]  Plaintiff has not amended her pleading.

According to Officer Dodson's Affidavit (Doc. # 9-1), he was dispatched to assist another officer with a burglary-in-progress on Eufaula Street.  On the way, Officer Dodson passed a black male wearing a light-colored shirt about five blocks from the Brasher residence.  Officer Dodson confirmed with a radio dispatcher that

---

[1] Plaintiff has submitted photographic evidence confirming that Wynter was substantially injured.

the person he observed walking briskly away from the Brasher residence matched the description of the burglary suspect, and he turned his car around. Thus, he never arrived at the scene of the reported burglary.

Officer Dodson located Wynter near the intersection of Eufaula Street and South Union Avenue. Officer Dodson, who was in uniform and in an identified police vehicle with activated blue lights, confronted Wynter, who tried to flee. Officer Dodson says he grabbed Wynter's shirt and asked for his name. Wynter tried to pull away. Officer Dodson grabbed Wynter's arm, and Wynter allegedly grabbed Officer Dodson's throat. Officer Dodson pushed Wynter away from him. The two struggled once more in the same manner. During the confrontation, Officer Dodson did not realize that Wynter suffered from a disability.

Wynter fled on South Union Avenue toward College Street. Officer Dodson says that he warned Wynter that he would dispatch his canine if Wynter did not stop running. When Wynter continued running, Officer Dodson commanded the canine to stop him. The dog successfully apprehended Wynter. Officer Dodson ordered the dog to return and ordered Wynter to stay on the ground. However, Wynter stood up and continued running. Officer Dodson commanded the dog to take Wynter down two more times because Wynter would not stay down after being stopped.

Another Officer, Anthony Spedale, arrived at the intersection of East Avenue and Eufaula Street. Officer Spedale ordered Wynter to stay on the ground, but Wynter jumped a fence and entered the grounds of a plant nursery. Officer Dodson commanded his dog to climb the fence and search the premises for Wynter. When the dog alerted to heavy brush, Officer Dodson commanded the dog to apprehend Wynter there, and the dog engaged Wynter for what Officer Dodson reports was thirty seconds. A third officer, Officer Tripp, arrived and he and Officer Spedale handcuffed Wynter. A fourth officer, Corporal Jesse Kellum transported Wynter to Dale Medical Center for treatment. Criminal charges against Wynter arising from the events on April 5, 2011, have been dropped, according to Plaintiff. (Doc. # 26, at 4.)

Officer Dodson represents that he had no knowledge of Wynter's autism until after Wynter was in police custody. Officer Dodson says that he determined that Wynter was a threat to him, other responding officers, and the public. He justified his use of force based on Wynter's resistance (grabbing Officer Dodson's throat) and the initial report that Wynter had tried to enter a home. There is no testimony or evidence in the record to contradict Officer Dodson's account.

**B.   Procedural History**

Plaintiff filed this suit on February 12, 2013. Defendants responded by filing a motion to dismiss and for summary judgment. (Docs. # 8, 9.) On April 3,

2013, this court denied Defendants' motion for summary judgment without prejudice and granted Plaintiff's request for leave to conduct discovery prior to responding to the motion for summary judgment. (Doc. # 21.) Defendants immediately moved for reconsideration of that order, which the court denied on October 10, 2013, after further briefing. The same day, a separate memorandum opinion and order issued dismissing, pursuant to Rule 12(b)(6), Counts Two, Three, Five, and Seven, all claims brought by Plaintiff on her own behalf, all official-capacity claims against Officer Dodson, and the claims for punitive damages against the City of Ozark. (Doc. # 31, at 10.)[2]

Defendants appealed the court's order allowing Plaintiff to conduct discovery prior to consideration of Defendants' motion for summary judgment, as well as the court's non-ruling on the City of Ozark's arguments for the dismissal of Counts Eight and Nine. The Eleventh Circuit remanded on October 17, 2014, with instructions to consider Defendants' motion for summary judgment without allowing Plaintiff to conduct discovery per Rule 56(d). (Docs. # 43, 44.) The Circuit also instructed the court to consider the City of Ozark's immunity defense to Counts Eight and Nine. Upon remand, Counts Eight and Nine against the City of Ozark were dismissed on immunity grounds. (Doc. # 45.) Defendants have

---

[2] There is no Count Six in the Complaint.

filed an answer without waiving or withdrawing their motion for summary judgment.  (Doc. # 47.)

Remaining are Plaintiff's § 1983 claim for excessive force in violation of the Fourth Amendment (Count One), state-law assault and battery claims against Officer Dodson in his individual capacity (Counts Eight and Nine), and Americans with Disabilities Act ("ADA") claim against the City of Ozark (Count Four). Defendants request summary judgment on each of these claims.

## IV.  DISCUSSION

### A.  <u>Count One – Excessive Force</u>

Officer Dodson argues that he is entitled to qualified immunity on the excessive force claim brought against him in his individual capacity.

### 1.  *Qualified Immunity Standard*

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is

> a muscular doctrine that impacts on the reality of the workaday world as long as judges remember that the central idea is this pragmatic one: officials can act without fear of harassing litigation only when they can reasonably anticipate – *before* they act or do not act – if their conduct will give rise to damage liability for them.

8

*Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013) (internal quotation marks and citation omitted).   Because qualified immunity is meant to relieve officials from the burden of trial or protracted litigation, qualified immunity questions should be settled "at the earliest possible stage of litigation."   *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

It is the burden of the defendant-official who invokes qualified immunity to establish that he was acting within his discretionary authority.   *Maddox*, 727 F.3d at 1120.[3]   If he satisfies that burden, the plaintiff must demonstrate that the defendant violated a constitutional right and that the right was clearly established when the defendant acted.   *Id.*   Rights are clearly established if the plaintiff offers: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."   *Id.* at 1121.   In *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), the Supreme Court advised that case law precedents "involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, [but] they are not necessary to such a finding."   Even so, since *Hope*, the Supreme Court

---

[3] Plaintiff does not dispute that Officer Dodson was acting within his discretionary authority as an Ozark police officer.

has continued to eschew broad statements of principle in favor of factually similar case precedents when deciding whether Fourth Amendment violations were clearly established.  *See, e.g.*, *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) ("[T]his is an area in which the result depends very much on the facts of each case. . . . .") (internal quotation marks omitted).

### 2.   *Arguments*

Officer Dodson contends that the repeated utilization of his police dog to apprehend Wynter was warranted and that it was reasonable for him to believe that Wynter would pose a threat to anyone he met as he fled the police.  Additionally, Officer Dodson asserts that Plaintiff cannot produce any clearly established Eleventh Circuit or Supreme Court authority prohibiting a police officer from deploying a canine to stop a fleeing suspect under similar circumstances.

The Supreme Court has held that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Determining whether an officer used a reasonable amount of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (internal quotations omitted).  Courts must not apply a

mechanical test but should pay careful attention the facts of individual cases, particularly "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Furthermore, the court must assume the perspective of a reasonable officer on the scene and must take into consideration that police are often required to make split-second decisions under tense and uncertain circumstances. *Id.* at 396–97.

As Officer Dodson notes, the Eleventh Circuit has applied *Graham*'s standard in published opinions involving canine apprehensions at least three times. *See Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012); *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009) (per curiam); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919 (11th Cir. 2000). In *Priester*, the Eleventh Circuit declined to extend qualified immunity to a police officer who used his canine on a compliant suspect who neither fled from nor threatened officers. 208 F.3d at 927. In *Crenshaw*, the court held that officers were entitled to qualified immunity because the plaintiff was suspected of committing armed robbery, had actively fled the police, had attempted to hide in dense woods in the night, and under the circumstances, was reasonably assumed to have been armed and dangerous. 556 F.3d at 1292. In *Edwards*, the Circuit denied qualified immunity where an officer unreasonably permitted his canine to attack the plaintiff for several minutes, causing extensive

physical injury, where the plaintiff was "laying prone with hands exposed and begging to surrender."  666 F.3d at 1296.

Officer Dodson compares and contrasts the facts of this case with the circumstances in each of these three Circuit cases, arguing that his use of force was reasonable in view of:  (1) Wynter's status as a suspect in an attempted home burglary; (2) Wynter's attack upon Officer Dodson; (3) Wynter's repeated disobedience of Officer Dodson's commands; (4) Wynter's flight in the dark; and (5) Wynter's final apprehension while hiding in a wooded area.  Officer Dodson also stresses that, unlike some police officers to whom immunity has been denied, he exercised restraint by ordering his dog to release Wynter every time that Wynter ceased resisting apprehension and detention. Officer Dodson also notes that there is no binding Eleventh Circuit or Supreme Court case law with materially similar facts that would have placed him on notice that his exercise of force was unlawful.

Plaintiff has responded by resting on and elaborating upon the allegations in the Complaint that Wynter is "completely nonverbal," "autistic," or "visibly disable[d] or special needs."  (Doc. # 23, at 5.)  She contends that Officer Dodson "failed to recognize" these characteristics as indicators of Wynter's autism.  (Doc. # 23, at 3.)  Plaintiff has suggested that Officer Dodson "clearly overreacted in his general assessment of the situation."  (Doc. # 26, at 4.)  She further disputes Officer Dodson's testimony that Wynter attempted to enter the Brasher residence

12

or that he assaulted Officer Dodson.  (Doc. # 26, at 4–5, 8.)  However, Plaintiff has not produced evidence to substantiate her positions on these matters or to otherwise rebut Officer Dodson's testimony.

### 3.  *Conclusions*

On this record, the court finds as a matter of law that Officer Dodson's conduct was reasonable under the circumstances and that he did not violate Wynter's right to be free from excessive force.  The result would likely be the same even if Plaintiff had offered evidence showing that Wynter's disability is so patent that Officer Dodson should have known Wynter was autistic or otherwise disabled.  Plaintiff asks more of Officer Dodson than the law requires when she argues that he should have appreciated Wynter's autism.

First, it was nighttime, and it is not clear that a person's patent autism could be fully appreciated in the dark.  Second, it was reasonable for Officer Dodson to believe that the reason Wynter was refusing to answer him, evading him, and attempting to flee was that he had attempted a burglary – not that he was nonverbal and autistic.  *Cf. Bates ex rel. Johns v. Chesterfield County, Va.*, 216 F.3d 367, 372 (4th Cir. 2000) ("[I]n the midst of a rapidly escalating situation, the officers cannot be faulted for failing to diagnose [the plaintiff's] autism.  Indeed, the volatile nature of a situation may make a pause for psychiatric diagnosis impractical or even dangerous.")  Finally, the existence of Wynter's disability would not have

13

required Officer Dodson to subtract Wynter's reported aggression from the equation when deciding whether to use canine force to apprehend him. *Cf. Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) (reasoning that, even if the plaintiff's son's mental disability was established in the record, it "d[id] not change the fact that he posed a deadly threat" to the defendant-officers).

Additionally, assuming Officer Dodson's conduct violated Wynter's constitutional rights, Plaintiff offers no excessive force case precedent "'on all fours' with the facts alleged in this case." *Jay v. Hendershott*, 579 F. App'x 948, 951 (11th Cir. 2014). Neither has she argued that the general principle of the Fourth Amendment "applies 'with obvious clarity to the specific conduct in question'" and that "it must have been 'obvious' to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time." *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). The court thus agrees with Officer Dodson that his conduct did not violate clearly established law.

For these reasons, Officer Dodson is entitled to qualified immunity on Count One.

**B.**     <u>**Counts Eight and Nine – Assault and Battery**</u>

Officer Dodson invokes discretionary-function immunity on Plaintiff's state-law assault and battery claims against Officer Dodson.   Section 6-5-338 of the Alabama Code provides that

> [e]very peace officer . . . shall at all times be deemed to be [an] officer[ ] of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Police officers are "peace officer[s] for purposes of § 6-5-338." *Borders v. City of Huntsville*, 875 So. 2d 1168, 1178 (Ala. 2003).   The test set out in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), defines Alabama's doctrine of state-agent immunity.   The same test in *Cranman* for deciding state-agent immunity questions "governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6-5-338(a)."   *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 741 (11th Cir. 2010).   Under *Cranman*,

> [a] State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> . . .
>
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a).

15

*Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006) (modifying category (4) of *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)).[4]

There is little doubt that a police officer's decision to use a canine to apprehend a fleeing suspect is a discretionary act because "there is no hard and fast rule as to the course of conduct that [he] must or must not take" when pursuing a suspect, and the officer must use his "judgment" to determine "what is just and proper under the circumstances." *Borders*, 875 So. 2d at 1178. *Cf. Thurmond v. City of Huntsville*, 904 So. 2d 314, 322 (Ala. Civ. App. 2004) (finding that a police commander's decision to march officers toward a crowd rather than using tear gas was a discretionary act); *City of Birmingham v. Sutherland*, 834 So. 2d 755, 762 (Ala. 2002) (holding that an officer's choice to make an arrest and choice of the manner in which to make the arrest were both discretionary functions).

Plaintiff has made no argument in response to Officer Dodson's plea for discretionary-function immunity, even after being given the chance to supplement her briefing. (*See* Doc. # 23, at 5 (merely requesting discovery prior to responding to the summary judgment motion).) Although *Cranman* articulates limited exceptions for the application of state-agent immunity, *see* 792 So. 2d at 405 (precluding immunity when a state agent or officer "acts willfully, maliciously,

---

[4] Prior to *Hollis*, category (4) of the *Cranman* restatement read: "(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons."

fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law"), there is no evidence that Officer Dodson should be precluded from receiving immunity for any of those reasons.

Accordingly, the court finds that Officer Dodson is entitled to the statutory discretionary-function immunity afforded by Alabama Code § 6-5-338(a).

## C.   __Count Four – ADA Violation__[5]

In Count Four, Plaintiff cites Title II of the ADA, 42 U.S.C. § 12132, and claims that the City of Ozark discriminated against Wynter by failing to train its officers to properly recognize and deal with individuals with disabilities.

### 1.   *Standard*

Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  A plaintiff alleging a violation of Title II must show

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

---

[5] The court previously denied the City of Ozark's motion to dismiss Count Four.  (*See* Doc. # 31, at 7–9.)

*Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

    *Bircoll* is the leading Eleventh Circuit case applying the ADA to facts involving law enforcement personnel.  The plaintiff in *Bircoll* was deaf and was arrested for driving while intoxicated.  He sued the county whose officer arrested him and claimed that the county subjected him to disability discrimination by denying him effective communication in the roadside administration of field sobriety tests, in the conveyance of a consent warning and Intoxilyzer test at a police station, and in his incarceration.

    The Eleventh Circuit did not decide "whether police conduct during an arrest is a program, service, or activity covered by the ADA" because the disabled arrestee-plaintiff could more easily rely on the final clause of Title II, which the court described as "a catch-all phrase that prohibits all discrimination by a public entity regardless of context."  *Id.* at 1084, 1085 (internal quotation marks omitted).  The court considered but rejected the position of the Fifth Circuit, which has held, for policy reasons, that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the

scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207

F.3d 795, 801 (5th Cir. 2000).[6]  The Eleventh Circuit explained that

> [t]he exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene *go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance*.  In other words, the question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety.

*Bircoll*, 480 F.3d at 1085 (emphasis added).  This "reasonable-modification inquiry

in Title II–ADA cases is a highly fact-specific inquiry."  *Id.* (internal quotation

marks omitted).  "What is reasonable must be decided case-by-case based on

numerous factors."  *Id.* at 1086.  In *Bircoll*, the court ultimately found no ADA

violations.

In an unpublished decision involving another hearing-impaired arrestee, the

Eleventh Circuit cited other ADA precedents when elaborating that an ADA

"plaintiff can proceed on theories of intentional discrimination, disparate treatment,

or failure to make reasonable accommodations."  *Rylee v. Chapman*, 316 F. App'x

---

[6] Other federal courts have taken stances similar to the Fifth Circuit's.  *See, e.g.*, *Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008) ("Where . . . officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns.  Further, we rely on and expect law enforcement officers to respond fluidly to changing situations and individuals they encounter.  Imposing a stringent requirement under the ADA is inconsistent with that expectation, and impedes their ability to perform their duties." (internal citation omitted)); *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 45, 73 (D. Me.) (collecting cases) *aff'd sub nom. Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006).

901, 906 (11th Cir. 2009) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)).  Where the plaintiff alleges "a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation.  *Id.* (citing *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)).[7]  Plaintiff's complaint and response to Defendant's motion (*see* Doc. # 23, at 5) suggest that Plaintiff is proceeding on the theory that the City failed to train and to make reasonable accommodations.[8]

Federal courts have recognized two different scenarios of ADA violations arising from arrests of disabled persons.  Under the first scenario, the "police mistake legal conduct caused by the [plaintiff's] disability as illegal conduct." *Glover v. City of Wilmington*, 966 F. Supp. 2d 417, 428–29 (D. Del. 2013).  For example, in *Glover*, an officer mistook the plaintiff's panic attack symptoms as evidence that the plaintiff had been driving while intoxicated.  *Id.* at 429.  Under the second scenario, the police fail to accommodate a disability once any exigent

---

[7] Notably, *Gaston* was a ADA Title I employment case.

[8] There is no allegation or argument that the City of Ozark police intentionally discriminated against Wynter or others or that autistic people as a class have suffered disparate treatment at the hands of the police.  One court has suggested that a claim like Plaintiff's could be better developed and analyzed under a disparate impact theory.  *See Waller v. City of Danville, Va.*, 515 F. Supp. 2d 659, 665 (W.D. Va. 2007) *aff'd sub nom. Waller ex rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171 (4th Cir. 2009) ("The act or omission involved in failing to train police officers to deal with mentally ill individuals may have a disparate impact on such individuals as a class. . . .").

circumstances pass and the arrest is made.  *Id*.  Here, Plaintiff's claim is akin to the first scenario, as she complains that Wynter was pursued and apprehended because Officer Dodson failed to recognize attributes of autism.  (*See* Doc. # 23, at 4.)

### 2.   *Arguments*

The City of Ozark notes that because Wynter is, according to Plaintiff's allegations, nonverbal, there was no opportunity for Wynter to convey the existence of his disability to Officer Dodson.  The City contends that Wynter could not have requested any sort of ADA accommodation.  Plaintiff has not claimed an accommodation should have been made for Wynter upon Wynter's demand, but rather, that the City should have both *trained* its police officers to recognize autism *and accommodated* autistic persons in accordance with that training.  Hence, in view of Wynter's nonverbal status, it would be unfitting to require him, as stated in *Rylee*, to "make[ ] a specific demand for an accommodation" in order to support his ADA claim.  316 F. App'x at 906.

The City of Ozark also contends that Officer Dodson's actions, in light of Wynter's physical resistance with and flight from Officer Dodson, were reasonable as a matter of law and not discriminatory.[9]  The City further asserts that Officer Dodson's uncontroverted testimony is that he did not know Wynter was autistic

---

[9] The City of Ozark's logic is basically that if there was no ADA violation in *Bircoll*, where there were no exigencies, there could certainly be no ADA violation in this case, where exigencies existed.

until after he was in custody.  For that reason, there is no evidence that Officer

Dodson discriminated against Wynter "by reason of [Wynter's] disability."

*Bircoll*, 480 at 1083.  Additionally, in its reply brief, the City notes that Plaintiff

has not identified "the legal source" of the City's alleged training requirement.

(Doc. # 24, at 6.)

Plaintiff has not countered these arguments.  (*See* Doc. # 23, at 4–5 (arguing

that she has pleaded a cognizable ADA claim and that she should be entitled to

discovery).)  She has likewise not expressly proposed what accommodation(s)

should have been made for Wynter, although one would presume that Plaintiff

would argue that no force, particularly a canine, should have been used to

apprehend Wynter.

### 3.   *Conclusions*

Upon consideration of the City of Ozark's arguments, *Bircoll*, and additional

persuasive authority not cited by Defendants, the court finds that the City of Ozark

is entitled to summary judgment on the ADA claim.

First, with respect to the theory that the City of Ozark denied Wynter a

reasonable accommodation, Plaintiff has not proven that the City of Ozark's

alleged discrimination or denial of accommodation was "by reason of" Wynter's

autism.  42 U.S.C. § 12132; *Bircoll*, 480 F.3d at 1083.  The record evidence is that

Officer Dodson lacked information about Wynter's disability when he pursued him

and did not intuitively suspect that Wynter had a disability when he encountered him.  Therefore, Officer Dodson cannot be said to have denied an accommodation to Wynter because of Wynter's disability, or to have discriminated on the basis of his disability.  Other district courts have reached similar conclusions at summary judgment.  *See, e.g.*, *Redding v. Chesnut*, No. 5:06-CV-321 (CDL), 2008 WL 4831741, at *8 (M.D. Ga. Nov. 3, 2008) ("Plaintiff does not appear to dispute that [the officer] did not know or have reason to know that Plaintiff was developmentally disabled when [the officer] knocked Plaintiff to the ground and attempted to restrain him.  For that reason, the Court cannot find that [the officer] discriminated against Plaintiff 'by reason' of his disability."); *Bridges v. City of Americus*, No. 1:09-CV-56 WLS, 2014 WL 1315339, at *11 (M.D. Ga. Mar. 31, 2014) ("The evidence does not suggest that [the officer] knew that [the plaintiff] suffered from a seizure disorder."); *cf. Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 758 (S.D. Tex. 2011) (requiring the plaintiff to "show either that he requested an accommodation or that defendant otherwise had knowledge of an [his] disability and needs, but took no action" (internal quotation marks omitted)).

Moreover, at least two circuit courts of appeal have affirmed the grant of summary judgment where the plaintiff could not satisfy this third element of a Title II claim.  *See Bates*, 216 F.3d at 373 (holding that the use of force was not "by reason of [the plaintiff's] disability, but because of [his] objectively verifiable

23

misconduct.  Such reasonable police behavior is not discrimination."); *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014) (quoting the same language cited *supra* from *Bates*).  The court adopts *Bates* to the extent that it agrees that Wynter's reported misconduct and flight – not his autism – was the reason Officer Dodson used his canine to repeatedly seize Wynter.

Secondly and more significantly for purposes of the law in this Circuit, under the fact-specific reasonableness inquiry required by *Bircoll*, 480 F.3d at 1085–86, the court concludes that it would have been unreasonable for Officer Dodson to have modified his protocol for apprehending a fleeing suspect given Wynter's reported status as an attempted burglar, his physical resistance to Officer Dodson, his disobedience of Officer Dodson's orders, and his flight.  Based on the perceived threat to public and officer safety and the need to pursue and detain Wynter promptly, it would have been unreasonable under the circumstances for Officer Dodson to have been required to assess and determine, prior to commanding his canine to apprehend Wynter, whether Wynter suffered from autism or some other disability.[10]

---

[10] There is potentially another reason that Plaintiff's "failure to train" claim under Title II may fail.  Plaintiff has claimed that the City of Ozark did not adequately train its officers and thereby prevented them from making reasonable accommodations as required by the ADA, but the text of Title II does not expressly require public entities to train their employees to recognize disabilities.  Other district courts have reasoned that the text of Title II cannot be read to require training.  *See Waller*, 515 F. Supp. 2d at 665 ("By its plain language, a violation of Title II does not occur until there has been an exclusion or denial of participation in, or the benefits of, a

## V. CONCLUSION

In accordance with the foregoing analysis, it is ORDERED that Defendants'

motion for summary judgment (Doc. # 8) is GRANTED as to Counts One, Four,

Eight, and Nine.  A separate final judgment will issue.

DONE this 19th day of February, 2015.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE

---

public entity's services, which manifestly occurs well *after* any training of the public entity's agents."); *Thao v. City of St. Paul*, No. CIV. 05-5306 PAM/RLE, 2006 WL 1004379, at *8 (D. Minn. Apr. 13, 2006) *aff'd*, 481 F.3d 565 (8th Cir. 2007) ("A violation occurs when a disabled individual is excluded from the participation in, or denied benefits of, a service, program, or activity.  Thus, a[n ADA] violation does not occur until the exclusion or denial occurs."). However, neither *Waller* nor *Thao* discusses specifically whether the general "discrimination" prohibited by Title II can be construed broadly to create a duty to train.